259 So.2d 33

**STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS**

v.

**James B. McPHERSON, Jr.**

**No. 51091.**

Feb. 28, 1972.

Rehearing Denied March 27, 1972.

Voelker, Ragland & Brackin, William B. Ragland, Jr., Lake Providence, for defendant-relator.

G. Ross Banister, Chester E. Martin, Jesse S. Moore, Jr., Johnie E. Branch, Jr., Alva Jones, Baton Rouge, for plaintiff-respondent.

SUMMERS, Justice.

The Department of Highways instituted this expropriation suit to acquire 115.374 acres across the farm of J. B. McPherson, Jr., in Madison Parish as a right of way for the Delhi-Waverly section of Interstate 20. The expropriation is sought in the manner authorized by Article VI, Section 19.1 of the Constitution and Title 48 of the Revised Statutes, Sections 441 to 460, inclusive.

McPherson's farm is roughly trapezoidal in shape with the short and parallel lines running north and south and the long lines running generally east and west. It contains 1662 acres.

The order of taking is dated June 21, 1968 and divests the owner of a strip of land 300 feet wide extending in an east-west direction, diagonally across the farm. An irregular, somewhat rectangular area on the west side of the farm is also taken for construction of an interchange and overpass where La. Highway 577 runs across the I–20 right of way in a north-south direction.

The case was tried in June 1969. At that time construction of this project was proceeding from west to east. The right of way enters McPherson's property roughly 500 yards north of the southwest corner. It proceeds from that point in an east-southeasterly direction a distance of two miles exiting defendant's property on its southern boundary approximately one-half mile west of the southeast corner. Thereby defendant's property is divided into two segments. A small triangular segment to the south of the expropriated right of way contains approximately 111.19 acres, and the northern remainder or parent tract contains the balance of the acreage north of the property taken.

At the time of the taking, the farm was bounded on the north by a railroad right of way. Joe's Bayou, a well-defined, meandering stream, enters the property about two-thirds of a mile from its northwest corner, dips to the south about one-half mile and then curves to the northwest, leaving the farm near its northwest corner.

La. Highway No. 577 serving the Waverly area also enters just east of the bayou and meanders in a southerly direction to the southwest corner of the farm, traversing the I–20 right of way near the southwest corner. Several small tracts along this highway within the defendant's farm are owned by others. Prior to the taking, on December 15, 1966, defendant sold a 20-acre tract in the southwest corner of the farm, which, together with a one-acre tract he did not own, forms the southwest quadrant of the interchange area.

A slough draining the western and northwestern parts of the farm, runs through the interchange area to the farm's south boundary just east of Highway 577. It has been deepened and widened and was

30 feet wide in 1968. The slough has been incorporated into the parish drainage system.

The Department deposited $47,495 in the registry of the court as the value of the land taken. This deposit is based upon an appraised value of $410 per acre, concurred in by two expert appraisers called by the Department. Neither appraiser felt that McPherson should be awarded severance damage for diminution in value to the remaining property, being of the opinion that if any severance damage resulted it would be more than adequately offset by the enhanced value resulting to defendant's land by construction of the interchange.

By McPherson's testimony and the testimony of his expert appraisers it was established that the farm had been acquired in two purchases, one in August, 1965 and the other in September 1966, for about $325 per acre. Thereafter McPherson improved the land by clearing trees from large tracts, "chunking" (removing debris), constructing drains, installing culverts, leveling, filling, enlarging fields, and building field roads. He accumulated a cotton allotment of 350 acres and produced the entire allotment. The balance and greatest part of the cultivable land is devoted to the production of soybeans; the entire farm being operated as a single unit under intensive cultivation. In addition to the capital improvements enhancing the property's value, a widespread and marked increase in land values during the period from the purchase to the taking was responsible for further increases in value.

Appraisers called by McPherson impressed the trial judge, as they do us, as being extremely well qualified through education and practical experience. Both were well acquainted with property values in the vicinage. All appraisers considered the property's highest and best use to be for agricultural purposes—farming cotton and soybeans. William P. Williams, one of the appraisers, used the market data and income approach for ascertaining the value of the land. He concluded the value of the land was $455 per acre as of June 1968, the date of the taking. Malcolm C. Sevier, the other appraiser, using the market data approach, concluded the land had a value of $500 per acre at the time of the taking.

The trial judge found the Sevier appraisal to be most realistic and accepted $500 as the value of the property taken. He, therefore, awarded $57,745 to McPherson for this claim. Without detailing the procedure used or the data accumulated by the appraisers to arrive at these values, we find them to be amply supported by the record.

McPherson also asserts that the taking diminishes the value of the remaining property. A feature of the farm's value as a producing unit is its size and its develop-

ment for cultivation. An elevated road running diagonally across the farm, altering the size and shape of the fields and impairing the natural southerly drainage, materially and substantially affect the property's utility and its market value.

A field road running across the farm from east to west, generally along the route of the proposed highway, will be expropriated; it will not be available after the taking to provide access within the farm to the north or to the south. The south remainder, a triangular tract of 111.19 acres, is effectively severed from the parent tract on the north by the limited access highway. Hereafter ingress and egress to and from the south remainder from the parent tract must be accomplished by using Highway 577 and traversing the overpass at the interchange. Upon entering the south remainder from Highway 577, or leaving the south remainder to get to Highway 577, the only access route, it will be necessary to traverse the slough which runs the entire length north and south of the south remainder near its western boundary. Thus, without a bridge to traverse the slough, defendant is effectively cut off from all that portion of the south remainder lying east of the slough, or approximately 100 acres.

Since the south remainder will hereafter be triangular in shape, its utility for farming is greatly impaired. The large, expensive implements required for the type soybean and cotton producing operation conducted by defendant cannot, without danger, negotiate the overpass in traffic to get to the south remainder from the parent tract, nor can these implements traverse the slough without a substantial bridge. Hereafter the eastern extremity of the south remainder, converging into a narrow point, as it does, will not lend itself to the use of these large implements.

Destruction of the field road, heretofore utilized by the defendant as an access route from Highway 577 on the west to the area of the farm north and south of the field road, and to the eastern reaches of the farm, will require the construction of another road to replace it along the north line of the interstate highway. This will provide access to the land to the north and east only. A like road will be required along the south line of the interstate highway to provide access to the area to the south and to the eastern portion of the south remainder.

Thus, where formerly defendant had one field road with culverts, it will now be necessary that two field roads be provided. Added to this, ditches and culverts will be required to coordinate drainage beneath the field roads with the culverts underlying the interstate highway. More land must be withdrawn from production to permit construction of these facilities. This altered drainage pattern will cause "pooling" of water at and near the culverts. Crop pro-

duction from the soil affected by the pooling will therefore be reduced.

McPherson's appraisers were of the opinion that these factors damaged the remainder of the property to the north and south of the right of way with a resulting diminution in its value. In both Williams' and Sevier's opinion the south remainder was reduced in value by $22,348.20; Sevier considered the north remainder damaged to the extent of $7,511.25. Sevier is corroborated in this last finding by Thomas Scott Dabney, an engineer who surveyed the property extensively to determine the effect of the highway construction on farm drainage.

The trial judge found that defendant had adequately established the need for a bridge across the slough and its cost. He felt, however, that item of special damage was included in the $22,348.20 estimate for damage to the south remainder. Accordingly, he disallowed the claim of $12,380—the cost of constructing the bridge.

The trial judge also rejected the Department's contention that McPherson's property in three quadrants of the interchange was enhanced in value and this enhancement was a special benefit which would more than offset the severance damage he claimed.

A great deal of time was devoted to testimony showing considerable increase in value to property at some interchanges located on completed segments of the I–20 highway. However, these conditions generally existed at interchanges in more populous localities and in areas where the interchanges served highways with higher traffic counts than that experienced on Highway 577. In any event, the values are speculative, as the trial judge found, and the proof of enhanced value of defendant's property at the interchange was not established with sufficient certainty to support a finding. That is, the effect of the Department's position was to say that when the interchange was completed, and when the traffic began to flow on I–20, McPherson's property at the interchange would be greatly enhanced in value. None of the enhanced values predicted were a reality at the time of the trial.

In questions relating to the enhancement in value of McPherson's property at the interchange, the Department's witnesses acknowledged that other properties nearby, which belonged to persons whose property was not expropriated, would most likely enjoy an increase in value along with defendant's property when the increase occurred. The advantage, if any, therefore, was not shown to be special to defendant. Such an increase in property value, if it occurred, would probably inure to those generally situated in the vicinity of the interchange, not to plaintiff alone.

Moreover, defendant's property in the vicinity of the interchange was of unusual-

ly high value before the taking. A number of established residences were located within the perimeter of McPherson's property along Highway 577 at this juncture. These tended to make McPherson's property near the interchange desirable for other residence sites and hence of greater value than property located at a distance from the interchange. This present high value, then, is attributable to the established residential character of McPherson's property near the interchange, and it is not attributable to the speculative increase to be brought about upon completion of the interchange.

The final question adjudicated by the trial court was the Department's claim that a sale of dirt by McPherson to the contractors for use on the interstate construction project amounting to almost $60,000 was a "windfall". Hence the Department should receive credit for this windfall to offset the severance damage defendant claims.

Aside from the purchase of dirt by the contractor from McPherson's farm, the contractors on this segment of the project, and other contractors on other segments, purchased dirt from a number of property owners whose property was unaffected by the expropriations. The trial judge concluded that McPherson should not be made to put back what he has received from dirt sales when others whose lands are not expropriated are not required to do the same.

Furthermore, the Department had not suggested to what extent the sale of dirt was a windfall. The judge pointed out that in any event the whole amount received for the sale of dirt was not a windfall, and the Department had utterly failed to establish by its proof or argument what portion of the $60,000 should be considered as a windfall and used as an offset against the severance damage claimed. Failing to establish this claim with some degree of certainty was deemed sufficient to sustain its rejection.

From a judgment in McPherson's favor for $87,704.45 (500 per acre or $57,845 for the land taken, $7,511.25 severance damage to the north remainder and $22,348.20 as severance damage to the south remainder), less credit for the deposit, and an additional award to cover fees of experts, the Department appealed to the Second Circuit. McPherson answered the appeal, praying that the award for severance damage be increased, particularly to include the cost of the bridge.

A motion to dismiss the Department's appeal was filed by McPherson based upon the Department's failure to timely pay the stenographer's fees to the clerk of the trial court. The motion was denied by the Court of Appeal and it is not urged here.

I

The Court of Appeal properly recognized (241 So.2d 543) that a defendant

who contests the adequacy of the estimate of just compensation in an expropriation proceeding has the burden of proving that the land taken has a greater value than the amount deposited and he must also establish the extent of severance damage if any. La.R.S. 48:453; State, Through Department of Highways v. Levy, 242 La. 259, 136 So.2d 35 (1962).

After reviewing the qualifications of the respective experts who testified concerning values, the Court of Appeal found, as we do, that the qualifications of Williams and Sevier were indeed impressive. Their familiarity with the lands and their knowledge of the effect of various factors, such as crop allotment quotas and soil quality, on the value of farm lands was considered superior to that of the State's appraisers. Too, the study and accumulation of data utilized by the landowner's appraisers was found to be especially thorough.

The Court had no difficulty, therefore, in approving the judgment of the trial judge and his acceptance of the value established by the landowner's appraisers over those who testified on behalf of the Department. Accordingly, the Court of Appeal approved those values.

Sevier, one of the experts tendered by McPherson, it will be recalled, appraised these lands at $500 per acre and the trial judge accepted this value in making his award. However, the Court of Appeal was of the opinion that McPherson was bound by the testimony of his own witness, Williams, who appraised the property at $455 per acre, the lesser of two appraisals by McPherson's experts. In this holding we find the Court of Appeal erred.

■ Expert opinions are not ordinarily conclusive. They are generally regarded as advisory in character. Unlike testimony to a fact, an opinion seeks only to assist the court in its effort to determine the ultimate fact. Thus opinions as to value are not binding on the trier of fact. Peiser v. Grand Isle, 224 La. 299, 69 So.2d 51 (1953); Housing Authority of New Orleans v. Gondolfo, 208 La. 1065, 24 So.2d 78 (1945); La. Power & Light Co. v. Dixon, 201 So.2d 346 (La.App.1967); State v. Wagner, 233 Minn. 241, 46 N.W.2d 676 (1951); 31 Am.Jur.2d, Expert and Opinion Evidence, § 183.

And there is no rule that a party cannot prevail unless the evidence produced to establish his case is harmonious and consistent throughout. Indeed, if that were the rule, success would rarely attend an attempt to prove an ultimate fact. Primm v. Market St. Ry. R. Co., 56 Cal.App.2d 480, 132 P.2d 842 (1943); Bitsekas v. Parechanian, 67 Cal.App. 148, 226 P. 974 (1924); Cf. Biaggini v. Toye Bros. Yellow Cab Co., 163 So. 780 (La.App.1935); 30 Am.Jur.2d Evidence, § 1082.

▆ Justice does not require a court to accept as an absolute verity the opinion of the expert witness of a party simply because it involves a value of property lower than that of another expert tendered by the same party. State, through Department of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964).

▆ Instead, the effect to be given to opinion testimony is governed by the weight the trier of fact accords to that testimony. The weight testimony is entitled to receive is determined by the professional qualifications and experience of the expert, the facts and studies upon which his opinion is based and, in case of land appraisals, his familiarity with the locality. La. Power and Light Co. v. Dixon, 201 So.2d 346 (La.App.1967). In all cases the possible bias of the witness in favor of the side for whom he testifies and the witness' character and credibility bear upon the weight of the testimony.

▆ These are all matters for the trier of fact. And when, as in this case, testimony of the witnesses is contradictory, the finding of the trier of fact will not be overturned unless manifest error appears in the record. We find none here. Housing Authority of New Orleans v. Gondolfo, 208 La. 1065, 24 So.2d 78 (1945); 31 Am. Jur.2d, Expert and Opinion Evidence, §§ 181–184. Accordingly, we agree with the trial judge that McPherson's property had

a value of $500 per acre at the time of the taking.

II

The Court of Appeal did not find it necessary to pass upon the correctness of the trial judge's award of severance damage being of the opinion that special benefits accruing to McPherson from dirt sales to the contractors in the amount of $60,000 was more than adequate to offset the claim for severance damage. The trial court judgment rejecting this claim of special benefit from dirt sales was accordingly overruled.

In our opinion the award for severance damage by the trial court was well-founded, and the dirt sales are not special benefits to McPherson's property which may be offset against severance damage.

▆ statute no deduction can be made from the value of the property expropriated on account of benefits derived by the owner from the contemplated improvement or work. La.R.S. 19:9; La. Civil Code art. 2633. However, the jurisprudence has established the rule that when damage is sustained to the remainder of the property by reason of the taking, special benefits to the remainder of the property, as distinguished from general benefits to property in the neighborhood, may be deducted from the damage to the remainder in the computation of severance

damage. The rule is stated in Louisiana Highway Commission v. Grey, 197 La. 942, 2 So.2d 654 (1941):

When a part of a tract of land is taken for the public use, it frequently happens that the construction and maintenance of the public work for which the land is taken inflicts some injury upon the remainder of the tract or parcel. And, while this is true, yet in other respects the remaining land may be benefited by the construction of the work. The benefits or advantages, if any, which may result from the construction of the work are either general or special. General benefits are those which are shared alike by all property owners in the neighborhood or community. Such damage as a property owner may sustain as a result of the construction and use of a public work cannot be offset by these general benefits. The reason is that the citizen whose property is taken cannot be compelled to bear more of the cost of the public improvement and general benefits resulting therefrom than is borne by other property owners whose property is neither taken nor damaged for the public purpose.

 In deciding whether the benefit is general or special we do not by rule make a definitive distinction. Each case must be determined on its own peculiar facts. We do say, however, that for the benefit to be

special it must be peculiar to the property itself by virtue of the improvement and not enjoyed in common with neighboring lands. 3 Nichols, The Law of Eminent Domain, § 8.6203 [1] (1965).

 Thus, in the case before us where dirt is sold to the contractor from the remainder of McPherson's land, and the same contractor and others acquired dirt from other landowners in at least six other locations, in the area of the highway right of way, the benefit is not special to McPherson. It is instead general to those located near the right of way who have the type soil desired and who are willing to sell.

The lands of the six other landowners who sold to the contractors were not affected by expropriation and were not damaged by the highway construction. Therefore no deduction can be made from the price they receive for dirt sales. Under these circumstances justice does not require that McPherson put back a substantial part of the amount realized from his dirt sale to offset severance damage to his property. To permit such an offset would be to compel McPherson to bear a greater proportion of the cost of the public improvement than others.

Although to some extent this dirt sale may have been brought about by the location of the highway construction project, the sale is due primarily to the soil's char-

acteristics which make it desirable for use in the roadbed of the highway. And this characteristic is uninfluenced by the highway construction, just as a gravel pit would not be. In the true sense, therefore, the sale of this dirt is an advantage to the owner, not the property. It is, we believe, analogous to a situation where a person's business, not his property, is improved by highway construction. It is as though he were selling a product of his farm. This improvement in business, as such, cannot be offset as a special benefit under the law. 3 Nichols, The Law of Eminent Domain, § 8.6203 [3] (1965); 27 Am.Jur.2d, Eminent Domain, § 368.

Thus a finding that the owner sold dirt from his remaining property to the contractor for the building of the highway is not the same as saying that the owner's remaining property was otherwise enhanced or specially benefited.

### III

Finding that the $60,000 dirt sale was a special benefit, more than sufficient to offset the severance damage McPherson claimed, the Court of Appeal found it unnecessary to pass upon the claim of special benefits to the landowner resulting from the increased value of property at the interchange. We do not agree. Since we find the dirt sale was not a special benefit, we overrule the Court of Appeal in this respect and turn to the question of the effect the interchange will have on the value of McPherson's property.

As the recitation of facts sets forth, the Department's experts were generally of the opinion that when the highway was completed, and when traffic began to flow, McPherson's property at the interchange would benefit by a substantial enhancement in value. McPherson's experts disagreed. They were of the opinion that there was not then and there would be no enhanced value in the future of the interchange property due to the highway construction under progress. None of the enhanced value the Department's experts referred to was yet a reality at the time of the trial.

■ Since this claim of the Department has to do with mitigation of the severance damage claimed and established by McPherson, the condemning authority has the burden of proving the special benefits as an offset against severance damage otherwise allowable. City of New Orleans v. Giraud, 238 La. 278, 115 So.2d 349 (1959). In this proof it is the special benefit which exists at the time of the trial which is pertinent. La.R.S. 48:453. That is to say, speculative benefits can no more be considered than can speculative damages. Nichols, The Law of Eminent Domain, § 8.6203 (1965).

■ Thus, no enhancement in value to the land surrounding the interchange having been shown as of the date of the trial,

the speculation that an increase in value is forthcoming cannot be considered in mitigation of damages to the remainder. Nichols, ibid, § 8.6201. Such a rule is well-founded. It would be improper to make McPherson pay now, by set off, for a benefit he has not received and which is merely speculative. Many circumstances could occur before the highway is completed which would prevent the predicted enhancement in value. Conceivably, the highway may not be completed at all. So the law wisely requires that the values be determined as of the date of trial.

■ Aside from the speculative character of the values at the interchange, another factor enters into the resolution of this issue. The record does not adequately establish that the benefit to accrue to McPherson's property in the event of an increase in the value of lands at the interchange will be a special benefit. As the testimony of the Department's own witnesses disclose, the enhancement in value will not be peculiar to McPherson's property alone. To a diminishing extent, the property from the immediate vicinity of the interchange and for a distance therefrom along Highway 577 will also benefit when the interchange is completed should a benefit in fact result.

Except for the McPherson property and one other tract, the other property to be benefited by completion of the interchange is unaffected by expropriation and it will not be damaged by the construction of the highway. In other words, in this neighborhood, all property will be enhanced but only McPherson must pay now by offset for a future speculative benefit. We think not.

Under principles announced in Part II of this opinion these benefits to the neighborhood generally are not to be classified as special benefits to be offset against the claim of severance damage.

IV

■ It was established without serious contradiction that it would cost $12,380 to construct an adequate bridge across the slough to provide access to about 100 acres of land in the south remainder. The trial judge was of the opinion that the experts had included this amount in the award for damage to the south remainder, and the claim was disallowed. The Court of Appeal approved this finding. However, our careful reading of the record compels us to conclude to the contrary. No allowance for a bridge was made by the real estate experts in the $22,348.20 calculation of damage attributed to the south remainder. To the contrary, these witnesses felt unqualified to estimate the cost of bridge construction, and so they computed the damage without regard to bridge cost, leaving the ascertainment of that claim to other proof. Their calculation was made

with the understanding that in addition thereto the bridge would be constructed. The bridge cost was, therefore, the subject of separate proof by a contractor experienced and knowledgeable in this type construction. This item should have been allowed also. City of New Orleans v. Giraud, 238 La. 278, 115 So.2d 349 (1959).

V

■■■ McPherson applied to this Court for review of the Court of Appeal decision, and we granted writs. 257 La. 601, 243 So.2d 272. After the record was lodged here, the Department filed a motion to remand. This motion was filed on December 1, 1971, two and one-half years after trial. The object of the motion to remand was to permit the Department to offer evidence of "actual" special benefits "accruing to the construction of the highway improvement."

The motion to remand is based upon an allegation that McPherson granted three options on January 19, 1971 and February 2, 1971 to sell 12.75 acres in three quadrants of the interchange for $65,000. It is alleged that McPherson declined to convey the optioned property, and suit for specific performance of the obligation was then (December 1, 1971) pending in the District Court of Madison Parish. By answer, McPherson opposed the motion to remand. He alleged, alternatively, that if a remand were granted, he reserved the right to show that since the trial the south remainder had been rendered entirely worthless, and that 125 acres of the north remainder had been seriously damaged and reduced in value by pooling brought about by impaired drainage resulting from the highway construction.

Six days were spent in the trial of this case. Five volumes of testimony containing 1074 pages were recorded and transcribed. In addition, many exhibits were introduced in evidence and referred to in the testimony. The trial judge very generously granted a wide latitude to both parties in introducing evidence.

We have already pointed out that the relevant time for determination of special benefits in mitigation of severance damages is the date of the trial, La.R.S. 48:453. Developments since the trial are therefore irrelevant to our findings.

Although we are not unmindful of this Court's authority to remand for the reception of additional evidence in a proper case where the ends of justice are served, this is not such a case. La.Code Civ.Proc. art. 2164. For one thing, the evidence proposed to be introduced by the Department is not relevant. And, furthermore, under similar allegations, this litigation might be protracted indefinitely, even after adjudication on remand.

*Decree*

For the reasons assigned, it is ordered, adjudged and decreed that there be judgment in favor of defendant, James B. McPherson, Jr., and against plaintiff, State of Louisiana, through the Department of Highways in the full sum of One hundred thousand, eighty-four and 45/100 ($100,-084.45) dollars, apportioned as follows:

1. Compensation for land taken $57,845.00

2. Severance damage to the north remainder 7,511.25

3. Severance damage to the south remainder 22,348.20

4. Cost of constructing bridge 12,380.00

less a credit of Forty-seven thousand, four hundred eighty-five and no/100 ($47,485.-00) dollars previously paid to defendant, together with five (5%) per cent per annum on the balance due from June 21, 1968 until paid.

The fees of defendant's experts are fixed as costs in the following amounts:

| | |
|---|---|
| William P. Williams | $1,488.00 |
| Malcolm C. Sevier | 2,727.00 |
| T. S. Dabney | 1,455.00 |
| James Gregory | 825.00 |

All costs to be paid by plaintiff.

McCALEB, C. J., dissents, being of the opinion that the award of the Court of Appeal is substantially correct.

DIXON, J., recused, having performed judicial acts in case in another court.

BARHAM, Justice (dissenting).

We granted this writ primarily to review the Court of Appeal's determination that the landowner's sale of dirt to a contractor for the construction of the highway for which a part of his land had been expropriated was a special benefit which would offset severance damages. I agree with the majority's conclusion that an expropriatee is not to be charged with a special benefit for the sale of dirt from the remainder of his property for use in the project construction.

However, two serious errors have been committed by the majority. While it has correctly permitted the landowner to retain the $60,000.00 received for the sale of dirt, it has also, according to my review of the record, allowed him to recover severance damages from the State to the north remainder of his property for the depreciation in value caused by the excavations made by him for the removal of dirt. Moreover, the majority has awarded full severance damages to the south remainder on the basis of appraisers' awards arrived at by ascertaining the difference in market

value of the whole before the taking (less the value of the part taken) and the market value of the remainder at the time of the trial; and it has actually, after making this full award, also given severance damages to the same area on a cost-to-cure basis when the defect to be cured had been included in the market value appraisals.

The majority has found that the qualifications of the landowner's appraisers, Williams and Sevier, were "indeed impressive" and accepted them as the appraisers whose opinions are controlling of the case; however, it has rejected portions of the testimony of these witnesses. In fact, it has accepted the calculations of value of one of these qualified experts on two issues, but not upon another important issue. No mention is made of the contradiction in the testimony of these witnesses. For the purposes of this dissent I will also accept these two witnesses to be well qualified, but I will review all of their testimony.

First, I consider the question of severance damages to the north remainder of the property. Although the majority and the trial court accepted both of the landowner's appraisers, Williams and Sevier, over all other expert witnesses in the case to establish market value of the part taken and, as I will show later, to establish the severance damages to the south remainder, for some reason in the determination of severance damages to the north remainder they failed even to mention Williams' testi-

mony. I cannot understand why the testimony of such a qualified and eminent expert, accepted for all other purposes, has not been given any consideration on this issue.

Sevier testified that the north tract had been heavily affected by the taking and suffered severance damages because a new road and drainage ditch would have to be built in order to afford field access and proper drainage of rain water from the north remainder onto the south remainder. Sevier opined that there was need for a large drainage ditch running parallel to the highway in order to collect all the water from the north remainder and carry it onto the south remainder. An engineer was called to buttress this proposition.

The natural flow of rain water is from north to south, the land has been cultivated so as to lend itself to a north-south water flow, and no change in the north remainder's topography has been made by the taking. The highway has been simply interposed between it and the south remainder. On the north side of the highway is the usual road ditch for collecting rain water flow, and according to all of the testimony numerous culverts and drainage facilities have been placed under the highway to remove the water collected in the north ditch of the highway by its natural flow to the south. It is admitted by all that even larger culverts were installed in the vicinity of the interchange in place of the small cul-

verts which once carried water under Louisiana Highway 577 into a ditch on the south remainder, which I will discuss later. The engineer sets forth an expensive plan for constructing roads and major drainage facilities on the north remainder, yet he admits that the natural flow of the water is to the south and that culverts will carry the water under the road, and finally seems to conclude that perhaps his expert opinion would contradict that of the highway engineers only to the extent of requiring two additional culverts under the highway.

The State's witnesses assigned a special benefit to the remainder because in reclassifying the remainder as commercial property rather than as farmland on account of its location at a major interchange after the taking, the market value was enhanced. They also testified that at least the north remainder would have suffered no damage. But conceding that we are faced with contradictions in regard to severance damage to the north, we have the answer by the landowner himself through the clear, unequivocal testimony of his expert Williams. Williams negates absolutely, positively, and categorically the testimony of the landowner's other appraiser, Sevier, and the engineer. According to Williams, the only damage to the north remainder is that caused by the landowner himself when he allowed 12 acres of the north remainder to be excavated to fulfill his contract for the sale of dirt. Williams' expert conclusion is that the partial taking in no manner adversely affected the north remainder, and that the north remainder suffered no severance damage. This is the most obvious instance where the majority has used only that evidence which would support the highest award to the landowner and has rejected all other.

I am of the opinion that the north remainder suffered no severance damages.

I move next to a consideration of severance damages to the south remainder, which consists of approximately 112 acres. The trial judge stated: "The defendant has clearly established with the appraisers, the engineer and the contractor, James Gregory, that to use, cultivate, or pasture the south remainder, much money must be spent for bridges, dirt work, and culverts, *but I am of the opinion that these losses are adequately included* in the awards for severance hereinabove provided." (Emphasis supplied.) The expression "awards for severance hereinabove provided" refers to the trial court's award of $22,348.20 as severance damages to the south remainder under the estimate of diminished market value made by Williams and Sevier. It is apparent from the above-quoted holding that the trial court rejected the cost-to-cure method of assigning severance damages in favor of the before-and-after market value approach. Both Williams and Sevier determined the severance damages to the

south remainder by arriving at the difference between the market value of the entirety before the taking (less compensation for the part taken) and the market value of the remainder after the taking as that market value was affected by reason of the partial taking.

The majority has allowed double recovery—that is, recovery under both approaches. As the trial court found, the value assigned as the cost to cure had already been considered and included in both appraisers' after-taking evaluations. In order for an appraiser to make a before-and-after determination of value for severance damages, he must of necessity account for all of the defects in the property caused by the partial taking which have effect upon the market value of the remainder.

The majority has increased the landowner's own appraisers' evaluation of total severance damages to the south remainder by 50 per cent. According to the appraisers' evaluation, the total severance damage to the south remainder, which was adopted by both the trial court and the majority here, was $22,348.20. The majority now adds $12,380.00 for the cost of constructing an expensive highway bridge over a farm ditch in order to give access between two portions of farmland for farm vehicles. Williams stated repeatedly that his appraisal of the after value of the south remainder had included an estimate for the cost of using culverts to bridge the ditch. This realtor-appraiser is qualified to determine for the purpose of market value both the extent to which denial of accessibility devalued the property and the adequacy of culverts as a remedy of the defect for a prospective purchaser.

Sevier on several occasions definitely stated that he had included within his estimate of a $200.00 per acre loss in value to the south remainder the need for and the cost of giving access to both portions of that remainder by way of a bridge. I will admit that on redirect examination after a recess the attorney for the landowner tried to rehabilitate Sevier in this regard by seeking a categorical response that the appraiser had not in fact considered the bridge in arriving at his remainder value. This attempt at rehabilitation does not refute that testimony repeated on cross-examination to specific questions relating to the elements which constituted the appraiser's $200.00 per acre depreciation of the south remainder.

On cross-examination, knowing that he had to give facts to justify his expert opinion of the $200.00 per acre depreciation, Sevier in careful repetitive response to precise questions began to account for the defects which he considered depreciated the south remainder. He first testified: "Well, Seventy-five Dollars ($75.00) for the loss of cultivatable land, and the problems in farming, Seventy-five Dollars

($75.00) for his drainage problems, for *his bridge and his access.*" (Emphasis supplied.) Realizing that the $75.00 values would not total $200.00 per acre depreciation, Sevier immediately thereafter stated these values should have been $100.00, and then in answer to the question "How about the bridge?", he answered: "Well, I really am not qualified to say what a bridge would cost, but in my estimation, that would be included in the hundred dollars for the overpass et cetera."

Appraisers who fix market value do not have to estimate cost to cure. In fact, they should not, except as a check upon their appraisal of market value. They should, as Sevier has just indicated, estimate the depreciation factor of the non-access upon the market value. Appraisers do not have to defer to experts on cost to cure. The market-value approach used by Williams and Sevier should not be supplemented by any estimates of cost to cure.

It is very clear, as the trial court concluded, that Sevier included in his appraisal of the after value of the south remainder the lack of access between the two portions of that remainder, and that this lack of access was in fact a considerable devaluating factor in his computation of that value. As previously noted, Williams' appraisal estimate included the depreciating factor of non-access. The trial court was perfectly correct in deciding to disregard the testimony of the engineer and the bridge-builder of the *cost* to make the particular improvements they testified were necessary for the restoration of the south remainder to its before-taking condition.

The appraisers had already determined the market value difference between the before-taking condition and the after-taking condition caused by the partial taking. The estimates by the engineer and the contractor of cost of restoration, of cure, were merely repetitive of the absence of access, the need for drainage, and the other devaluating factors which had already been considered and awarded by the two appraisers. The trial court accepted, and we should accept, the best approach for determining severance damages—that is, the difference in the market value before the taking and the market value of the remainder after the taking, as reflected by the damage caused by the partial taking. That approach fixes the severance damages at $22,348.20. Certainly we cannot cumulate the value under that approach with the value under a cost-to-cure approach.

I conclude that the north remainder suffered no severance damages, only damage which the landowner visited upon himself advisedly in exchange for the price he received for the dirt which was removed from his property. Just as he cannot have the dirt sale charged against him as a special benefit, neither can he charge the damage suffered by the dirt removal to the State as an item of severance damages.

I agree that the south remainder suffered severance damages because of the excess water which will collect and pond in certain places, the unusual shape which will make impossible ordinary farming methods, difficulty of access between it and the main farm to the north, and lack of access between the two portions of the south remainder. However, like the trial court, I accept the landowner's appraisers' evaluation of severance damages of $22,348.20. I must reject the special cost to cure, the bridge construction on the south remainder, as having already been included in the award of Sevier and Williams under their before-and-after market value approach. The majority's award should be reduced by $7511.25 and $12,380.00, or a total of $19,891.25.

For these reasons I respectfully dissent.