340 So.2d 579 (1976)
Theo L. GALLOWAY
v.
James C. GASPARD.
No. 10934.
Court of Appeal of Louisiana, First Circuit.
November 15, 1976.
*580 Doris Gates Rankin, Baton Rouge, for the plaintiff-appellant.
C. James Carville, Jr., Baton Rouge, for the defendant-appellee.
Before LANDRY, EDWARDS and COLE, JJ.
LANDRY, Judge.
Plaintiff, Theo L. Galloway (Appellant), appeals from judgment rejecting his claim to be recognized as owner of an Alaska Malamute canine and declaring the animal to be the property of defendant James C. Gaspard (Appellee). We affirm.
In essence Appellant urges the following errors on the part of the trial court: (1) Finding that Appellant did not adequately establish the identity of the animal in dispute; (2) Failing to accept the testimony of Appellant's expert despite Appellee's omitting to produce any expert testimony whatsoever; and (3) Denying Appellant the right to cross-examine witnesses whom Appellee summoned, but did not call to testify, and as to whom Appellee stipulated their testimony would be cumulative of that given by other Appellee witnesses who were called to testify on Appellee's behalf and who were subject to cross examination by Appellant.
In about mid August, 1971, Appellant, who resides at 390 Marian Drive, Baton Rouge, Louisiana, purchased an Alaska Malamute Dog, which animal was whelped approximately six weeks previously, on July 31, 1971. From the date of its purchase until May 5, 1974, the dog remained at Appellant's home except for four or five instances in which the animal strayed for a day or two and returned. On May 5, 1974, Appellant's dog disappeared and did not return until July, 1975, when the animal allegedly began following Appellant's son home while the youth was still about five blocks from the Galloway residence.
From early 1973, until June, 1975, Appellee lived at 734 Highland Park Drive, Baton Rouge, approximately five or six miles from *581 Appellant's residence. In March, 1974, Appellee acquired a male Siberian Husky from Appellee's brother who resided in Colorado. Appellee's dog, whelped January 31, 1974, was approximately 86 weeks old when this action was instituted. In June, 1975, Appellee moved to 229 Ardenwood, Baton Rouge, which is only a few blocks from Appellant's home. Prior to Appellee's moving to the Ardenwood address, his dog disappeared twice. The first time for three days following which the animal was found about three miles from Appellee's residence. The second time, the dog was gone for two hours and was found running back toward home. After moving to Ardenwood, Appellee's dog disappeared twice, the first time occurring about a week after Appellee moved. The dog disappeared again in June, 1975, and, when the animal did not return after several days, Appellee ran a lost dog advertisement in the local newspaper. Appellant responded to the ad by calling Appellee and advising that Appellant had a dog which answered the description of the dog advertised by Appellee but that the animal was in fact Appellant's dog which had been missing for quite some time.
Appellant claims the animal on the grounds that the dog followed his son home; the general appearance and markings on the animal in question are the same as those on the Alaska Malamute which Appellant raised; the animal in question has only one testicle due to the surgical removal of an undescended testicle, which operation Appellant had performed on his dog; and, the presence of a scar or lesion in the general vicinity of the surgery performed on Appellant's dog.
Appellee's assertion of ownership rests on the ground that since its whelping, his dog was missing only a total of about one and one-half weeks; that the animal had only one testicle, but that no surgery was performed on this portion of his dog's anatomy; and that the unique facial markings on the dog in question are those on his dog, especially the two unsymmetrical lines running down both sides of the animal's snout.
To establish the age of subject animal at considerably more than 86 weeks at the time this action was begun, Appellant introduced the testimony of Dr. Charles Robert Root, Professor, Louisiana State University, Department of Veterinary Clinical Sciences, who qualified as an expert in the field of veterinary radiology. He concluded that because of the age differences in the dogs involved, the only method of determining the age of the animal in dispute with any degree of accuracy was by radiographic studies of the animal's skeletal system. Dr. Root explained that such studies are predicated on the elapsed time from birth to the time of closure of the major growth center of a dog's skeletal system. He noted that bones in the pelvic area fuse latest in the life of a canine. On July 16, 1975, Dr. Root took lateral radiographies of the pelvis and lower spine of the dog in question and found no evidence of a cleft at the iliac crest, which would indicate the presence of cartilage tissue that had not ossified. Because the growth center of the animal in question was found to be completely ossified and fused, he concluded the animal was at least 130 weeks of age at the time of his examination. He was of the opinion that the possibility of complete fusion at earlier than 130 weeks was most remote. He testified that in cases which he had handled involving dogs of known age, he had not observed such fusion at less than 130 weeks. His opinion was based on charts contained in the 1967 edition of Dr. Carlson's book, a standard reference used in the field of veterinary science and generally accepted in the profession. The chart entitled "Fusion of Epiphysis" indicates that fusion commences at 53 weeks and the epiphyseal closure is complete at 130 weeks. Dr. Root admitted the chart does not purport to indicate whether 130 weeks is the maximum, minimum or average age of full fusion. He also conceded he did not know the breed or breeds of dogs used in the preparation of the chart. He was of the opinion the dogs used in compiling the chart data were not of an extreme breed and that the chart accurately represents the age of an average *582 dog, plus or minus some standard deviations.
Dr. Gordon Pirie, Veterinarian, was well acquainted with Appellant's Alaska Malamute and recalled treating the animal approximately two years prior to trial. He performed a cryptorchid operation on the dog, which involved the surgical removal of an undescended left testicle from the subcutaneous area of the flank. An examination by Dr. Pirie prior to trial disclosed a disturbance on the skin of subject animal, similar in appearance to the surgical scar left from the incision he made at the time of the surgical operation on Appellant's dog. Dr. Pirie conceded, however, the scar or disturbance noted could have been due to some other cause than surgery.
Appellee's Siberian Husky was treated by Dr. Clarence B. Hackett, Veterinarian, from March 2, 1974, until July 17, 1975, during which interval Dr. Hackett saw the animal approximately 14 times. Treatment administered included distemper vaccinations, trachial bronchitis, possible snake bites and a bilateral pectineal myotomy for hip dysplasia. Dr. Hackett's last examination was incident to the disputed ownership. Dr. Hackett had no reason to believe the animal he examined preparatory to trial was not the same dog he had seen previously. He conceded, however, he could not be absolutely certain it was the same animal. He also stated that so far as he knew the only distinction between an Alaska Malamute and a Siberian Husky is that a Malamute is a larger breed of dog.
Appellee's brother, Guy Gaspard, testified he owned a Siberian Husky bitch while he resided in Colorado. His dog whelped on January 31, 1974, and he gave one of the litter to Appellee. He noted some distinguishing marks on the dog, primarily that as a puppy it had a cloverleaf mask on its face, the line of which coming down the right side of its nose was longer than that on the left side. From photographs taken at the time of whelping and later photographs, which were offered in evidence, he identified the markings on subject animal to be similar. He further testified to having seen Appellee's dog on several occasions and was certain the animal in question was the same dog given Appellee.
Appellee called three teenage witnesses, all friends of Appellee's children and who frequently visited in Appellee's home. Each testified substantially that they were familiar with Appellee's dog having known the animal a long time and having seen it frequently. In essence, each testified they thought the animal was Appellee's dog and none could say the animal did not belong to Appellee.
The trial court concluded that Appellant had not borne the burden of establishing his case (in this instance, the identity of the animal in question) by a preponderance of the evidence as required by law. The court so found because the testimony of Appellant's expert concerning canine ages as reflected on the chart in question, was based on the assumption the chart represented an average age of epiphyseal closure, and considering all of the testimony, Appellant failed to establish that more probably than not the dog belonged to Appellant.
The trier of fact is not required to accept the testimony of an expert as decisive merely because the opposing party failed to produce an expert witness. The effect to be given expert testimony is the weight accorded it by the trier of fact. The weight such testimony is entitled to receive is determined by the professional qualifications and experience of the witness and the circumstances and materials on which the opinion is based. State Through Department of Highways v. McPherson, 261 La. 116, 259 So.2d 33 (1972); Middle Tennessee Council, Inc. v. Ford, 274 So.2d 173 (La. 1973); 31 Am.Jur.2d, Expert and Opinion Evidence, Section 183, page 748.
The evidence of an expert witness is received by a trial court pursuant to the same manner as evidence of non-experts, and is to be weighed by the trier of fact the same as other evidence. The trier of fact is not bound by expert testimony.
We find no merit in Appellant's contention that the testimony of Appellee's *583 witnesses is not entitled to the same weight as that of Appellant's expert because Appellee's witnesses were friendly to Appellee. Interest does not disqualify a witness, or render his testimony ipso facto unworthy of belief. Rather the testimony of an interested witness is to be weighed in the light of the interest disclosed in the record. The trial court considered the testimony of all the witnesses; it weighed the evidence in the light of the circumstances on which the expert testimony was predicated and that of Appellee and his witnesses in the light of their interest and/or acquaintenceship with Appellee. We reiterate that a trier of fact is not required to accept the unrefuted testimony of an expert witness; he may substitute his own common sense and judgment for that of an expert where, in the opinion of the trier of fact such substitution appears warranted by the evidence as a whole. Webster v. Offshore Food Service, Inc., 5 Cir., 434 F.2d 1191, cert, denied, 404 U.S. 823, 92 S.Ct. 44, 30 L.Ed.2d 50.
The trial court was obviously impressed with Dr. Root's expertise. However, because Dr. Root's opinion was based on what Dr. Root believed to be the average age for fusion of canine bone structure, the possibility existed that the bones of the dog in dispute could have fused at an earlier age. As we noted in Bogasky v. Falsetta, 189 So.2d 98 (La.App. 1st Cir. 1966), "proof that something is impossible serves to contradict, but proof that it is possible has little or no probative value as to the ultimate issue of fact unless all other alternatives are proved to be impossible".
It is axiomatic that the party with the burden of proof must establish his cause beyond mere probability and conjecture. He must prove his case by a preponderance of credible evidence meaning evidence which is of greater weight and more convincing than that offered by his opponent, and which, because it best accords with reason and probability, or because of its more convincing nature and quality, best tips the scales of justice upon whom the burden rests. Alexander v. St. Paul Fire & Marine Insurance Co., 312 So.2d 139 (La. App. 1st Cir. 1975).
We find no merit in Appellant's contention that the trial court committed reversible error in refusing to allow Appellant to cross examine witnesses whom Appellee had summoned and who did not testify upon Appellee advising the court their testimony would be cumulative of that of other friends and acquaintances of Appellee and his family.
Appellee offered to stipulate as to the testimony of these witnesses but Appellant refused to join in the stipulation. In civil cases it is presumed that the testimony of a subpoenaed but uncalled witness would be unfavorable to the party who has summoned the witness. However, the adverse presumption does not apply when failure to call the witness is explained. Veillon v. Sylvester, 174 So.2d 189 (La.App. 3rd Cir. 1965); White v. Plodzik, 213 So.2d 68 (La. App. 1st Cir. 1968); Barrois v. Service Drayage Co., 250 So.2d 135 (La.App. 4th Cir. 1971).
The trial court found the failure of Appellant to stipulate as to the testimony of the uncalled witnesses was a matter of no particular moment inasmuch as their testimony would be merely cumulative as to the identity of the animal. In this regard the record shows that the three acquaintances called by Appellee testified in general terms concerning their knowledge and acquaintanceship with the dog in question. It also appears that of the three such witnesses called, only two were cross-examined by Appellant and that the testimony elicited on cross-examination did not detract from the quality of their testimony.
In large measure the decision herein by the trial court involved a credibility determination. We find the rule which mandates affirmation of a factual determination not shown to be manifestly erroneous, is peculiarly appropriate in this instance. Cantor v. Koehring Co., La., 283 So.2d 716 (La.1973).
The judgment is affirmed at Appellant's cost.