SEXTON, Judge,
dissenting.
I take issue with the majority view that the state failed to show an offset to the defendant’s proven severance damages by its failure to prove special benefits in excess of those severance damages.
I am inclined to think the majority is correct in its holding that the measure of any severance damages and offsetting special benefits are to be determined as of the time of taking.[1] If so, then obviously that *28 determination must be made with the assumption the project will be completed in the manner planned and evaluated in that light. Tate, Legal Criteria of Damages and Benefits — The Measurement of Taking-Caused Damages to Untaken Property, 31 La.L.Rev. 431, 441 (1971).
Thus, the comfort the majority finds in the “concession” of Mr. Dupree, the Department of Highways’ primary appraiser, that an investor purchasing the property in 1974 for Dupree’s estimated price would not have made a good deal because of the slow development, is particularly inappropriate. Mr. Dupree’s obvious point was that the property had developed slowly because an integral part of the concept of the 1-220 loop, the bridge over Cross Lake— which will join the northeast and northwest quandrants of the loop — was still not completed at the time of trial, having been delayed by extensive federal litigation. In other words, Dupree’s “concession” was based on the fact that the bridge had not been completed. Thus, I believe that any reliance the majority places on this particular testimony of Mr. Dupree is inappropriate because if damages are determined as of the time of taking, then benefits must be evaluated with the completed project in mind.
If it is correct that we assess damages and benefits as of time of taking, then we may not consider the very interesting fact that Mr. Módica, on September 12, 1985, some eleven years after the taking, in the face of a depressed local economy but with the Cross Lake bridge finally in progress, sold the large southeast remainder of approximately 135 acres for $1.4 million, or just over $10,000 an acre — a fact appellant vigorously asks this court to consider.[2]
Likewise, we probably cannot consider the fact that Mr. Montgomery, one of the landowner’s appraisers, testified that he had negotiated with an asphalt paving corn-pany to buy a portion of the southeastern remainder adjacent to the railroad at about $5,500 per acre. The record is unclear as to the exact point in time when these negotiations occurred. However, they obviously occurred at some point during the eleven years between the quick-taking and the trial. I also assume we cannot consider Mr. Montgomery’s testimony that the sale did not occur because Mr. Módica sought a higher price than the asphalt company offered.
I do believe, however, that we can consider the fact that the asphalt company, which eventually purchased property on the other side of the railroad tracks from Mr. Modi-ca’s property, preferred the Módica site because of its topography. Visibility is an important part of special benefits, as the majority noted.
Mr. Montgomery conceded in his testimony that the existence of the major interchange with four full ramps increased the value of the remaining property and that he did not consider the question of special benefits. Perhaps, as the majority states, it was not part of his task because the state had the burden of proving special benefits. Even so, his knowledge of the topography and his failure to note the reason for the reduced traffic in light of his part in the substantial offer which Mr. Módica refused calls his testimony into question. In other words, while it may be inappropriate to consider the fact of the negotiations with the asphalt company as substantive evidence, I suggest it is an appropriate consideration when evaluating the credibility of Mr. Montgomery’s other testimony.
Also, one of Mr. Montgomery’s major concerns was the limited number of automobiles on the bypass. This assessment was obviously based on his observation of the effect of the bridge litigation. I suggest this fact also calls Mr. Montgomery’s *29 assessment of severance damages into serious question.
Indeed, the trial judge does not seem to have placed much weight on the testimony of Mr. Montgomery in finding severance damages, but seems to have accepted the testimony of Mr. Harvill, the other appraiser for the landowner. Although Harvill did testify that he considered special benefits, I do not find that the details of that consideration were specified by him. The import of Harvill’s testimony, as I appreciate it, is that the property at issue only received the same general benefits as the other property in the neighborhood and that any special benefits were minor in nature. In other words, this property, bordering on and enjoying direct full access to a major roadway and separated from an industrial park by a railroad, only had a general benefit “just like everybody else.”[3]
Thus, I am concerned with the trial court’s determination on this record that an assessment of severance damages is appropriate. Further, I find little support for the assessment thereof in the oral reasons of the trial court. The value of the trial court’s reasons to me is that they illustrate the difficult problems of evaluation presented by this case due to the complexity of the law, the significant period between the taking and the trial, and the failure to complete the project for which the property had been taken as envisioned even by the date of the trial.
In all fairness, it would seem that the majority’s primary contention is not the value of Harvill’s testimony but the fact that all appraisers found some severance damages and that the state failed to bear its burden of proving special benefits.
As the majority points out, this circuit has specifically stated that the fact that the remainder “is within the quadrant of an interchange” does not in and of itself establish enhanced value. See State, Department of Highways v. Anderson, 356 So.2d 1086, 1089 (La.App.2d Cir.1978).[4] However, the case that originates the distinction in Louisiana between general and special benefits, Louisiana Highway Commission v. Grey, 197 La. 942, 2 So.2d 654 (1941), espouses a contrary position. The Grey court contemplated that land which fronts on an improved road, and thus enjoys peculiar new access as a result, obtains a special benefit by definition.
The benefits or advantages, if any, which may result from the construction of the work are either general or special. General benefits are those which are shared alike by all property owners in the neighborhood or community. Such damage as a property owner may sustain as a result of the construction and use of a public work cannot be offset by these general benefits. The reason is that the citizen whose property is taken cannot be compelled to bear more of the cost of the public improvement and general benefits resulting therefrom than is borne by other property owners whose property is neither taken nor damaged for the public purpose.
# * sfs * * *
*30 The rule is different as to peculiar or special benefits, or those affecting a particular estate by reason of its direct relationship to the improvement. If, as a result of constructing a new work, the remaining land or part of it is left fronting on a road or street, and the land fronting the road or street is more desirable and more valuable because of the frontage, the advantage thus gained is a special or peculiar benefit, and damages to the remaining property may be offset by such benefits. * * * *
Louisiana Highway Commission v. Grey, supra, 2 So.2d at 660-661. [Emphasis supplied.]
Indeed, the Grey court was impressed by the United States Supreme Court’s United States v. River Rouge Improvement Company, 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (1926), where the court determined that the property immediately adjoining an improved stream enjoyed a special benefit, while other lands in the vicinity obtained only a general benefit.
I am aware that it has been suggested that the Louisiana Supreme Court has retreated from Grey. Comment, The Confusing Death of the Special Benefits Doctrine in Louisiana Expropriation Law, 34 La.L.Rev. 820 (1974). However, I do not read State, Through Department of Highways v. Trippeer Realty Corporation, 276 So.2d 315 (La.1973), and State, Through Department of Highways v. McPherson, 261 La. 116, 259 So.2d 33 (1972), to the same effect as does the author. I suggest those cases represent more of a modification than an extinction of Grey,[5] but I will agree with the author of the comment that an excellent argument can be made that the “full extent of his loss” language of LSA-Const. Art. 1, § 4 (1974) provides an excellent basis for return to the more logical Grey rule, if Grey is no longer valid.
Certainly, common sense and our every day experience with major interstate interchanges tells us that Mr. Modica’s “briar patch” is one into which most of us would enjoy being thrust.[6] Nevertheless, regardless of my concern about the current state of the law, I believe the trial court evaluation was clearly wrong, even when scrutinized under the standards of State, Through Department of Highways v. William T. Burton Industries, Inc., 219 So.2d 837 (La.App.3d Cir.1969), writ refused, 254 La. 14, 222 So.2d 67 (1969), on which the majority relied. While the state did not specifically present the testimony of its appraisers within the context of the Burton Industries, Inc. factors, the presence of most of those factors with respect to this particular piece of property is, I believe, apparent from the record.
We cannot disregard the fact that a railroad separates the large southeastern remainder from the Bossier industrial park. Thus, it is obvious that the property not only enjoys direct railroad access but, as Mr. Dupree emphasized, is well located for access to the west by proximity to 1-20 and for access to the north by proximity to Highway 1 and Highway 171 by virtue of the fact that the property adjoins and has immediate access to 1-220. These features pertain even without the completion of the Cross Lake bridge which will furnish access to southern and southwestern routes.
Furthermore, Mr. Dupree noted that the clear visibility of the property was an obvious asset. Mr. Willet also testified to the exemplary access the property enjoyed and to the fact that the diamond interchange significantly raised the highest and best use of the remainder.
My review of the record is that the trial court failed to seriously contrast this testimony with the previously noted testimony of the landowner’s appraisers. When I do so, particularly keeping in mind the abutting interstate and railroad, which this property alone enjoys, I am struck by what I perceive to be an error by the trial court.
I respectfully dissent.

. However, the further I delve into this subject, the more confusing it becomes. The first espousal of this problem that I can locate is in State, Department of Highways v. Tyler, 326 So.2d 349 (La.1976), authored by Justice Calogero. The author conceded the statute then in effect, LSA-R.S. 48:453 per Act No. 107 of 1954, provided that severance damages were to be determined at the time of trial. Then Justice Calogero stated that the test therefor was the difference between the market value of the remainder ‘before and after the taking.” Only one Louisiana Supreme Court case was cited for that proposition. Through an apparent printing error, the name and citation appear as "State, Through Department of Highways v. M.G. Real -La. 1035, 229 So.2d 89 (1969);". This citation is actually for the case of State, Through Department of Highways v. Mason, the complete citation of which is 254 La. 1035, 229 So.2d 89 (1969). Since Mason is on point, I assume that this is the intended authority. In Mason, Justice McCaleb in turn cited: 4 Nichols on Eminent Domain, § 14.232 (3rd ed.), and several Louisiana cases on the subject, the latest of which was State, Through Department of Highways v. Central Realty Investment Company, 238 La. 965, 117 So.2d 261 (1960). However, this latter case involved a May 1954 expropriation which was before the effective date of Act 107 of 1954. Obviously, the other cases also preceded the act.
In Tyler, Justice Calogero also cited State, Through Department of Highways v. M.G. Realty Company, 276 So.2d 918 (La.App.3rd Cir.1973), a court of appeal opinion which was not concerned with the time aspects of valuation. M.G. Realty simply held that the "market value” approach was the appropriate gauge rather than "cost to cure.”
Compounding the foregoing is that in State, Through Department of Highways v. Trippeer Realty Corporation, 276 So.2d 315 (La.1973), three years before Tyler, Justice Calogero specifically stated that the time of trial is the time of valuation, based on LSA-R.S. 48:453. Justice Tate was on the court at that time and his law review article cited by the majority in the instant case had been published in 1971. My reading of that article is that Justice Tate accepted, but criticized, the time of trial rule.
Moreover, I am unable to read State, Through Department of Highways v. Wells, 308 So.2d 774 (La. 1975), cited by the majority in the instant case as support for this proposition. While the pertinent paragraph at page 776 does espouse this proposition (and we know the author, Justice Tate, was not in favor of the time of trial rule), I suggest that the purpose of the pertinent paragraph was to make the point that the time of trial rule should not penalize a landowner for an appreciating economy.
Surely, it can’t be reasonably argued that the holding of Tyler is that LSA-R.S. 48:453 at that time meant that value was to be assessed at trial but was to be measured as of the taking. That *28 reading makes the statute a superfluous statement. The time of trial is obviously the only time a judge can assess value. All of the foregoing causes me serious concern over the validity of the valuation “at taking" rule apparently in effect at the time at issue. Regardless, it does appear that Tyler is the latest pronouncement. Thus, I can only read it as a jurisprudential change of the law.

. Of course, if value is determined at the time of trial, then Mr. Módica obviously has enjoyed extensive special benefits.

. I will concede that my concern about Montgomery’s point here may be legal rather than factual as it may involve Louisiana’s definition of special benefits — a question perhaps as confusing as the old law on time of evaluation of severance damages, as I will discuss subsequently-

. Of interest is that in the Anderson case, the state had expropriated three acres from 4.5 acres located at only one quadrant of a diamond interchange. Also, Anderson cites State, Through Department of Highways v. Westport Development Company, 332 So.2d 918 (La. App.2d Cir.1976), in support of that proposition. Westport did indeed involve the dissection of the landowner’s property by a major interchange. (This interchange, known as 1-20 and Pines Road, has become one of the busiest and most well-developed in this area.) The major point in Westport, however, was that the state did not attempt to prove special benefits but only argued that special benefits overcame the landowner's proven severance damages. I suggest the facts of those cases are of no real help in evaluating the quality of the state’s evidence concerning special benefits attendant to the instant interchange. Anderson involved only a very sm'all remainder in one minor quadrant, and the primary point in Westport is that the Highway Department offered only an argument rather than proof. The only value of these cases to the instant case is that they assert the general proposition that a diamond interchange is not by definition a special benefit which was relied on by the majority.

. For a view which seems midway between mine and that of the comment’s author, see State, Through Department of Highways v. Moseley, 390 So.2d 951, 955-956 (La.App.2d Cir. 1980).

. Also, it seems unfair to allow a landowner to inordinately benefit at public expense in such difficult financial times for our state.