471 So.2d 1011 (1985)
Lloyd AGUILLARD, Sr.
v.
Lester LANGLOIS and State Farm Fire and Casualty Company.
No. 84 CA 0727.
Court of Appeal of Louisiana, First Circuit.
June 25, 1985.
*1013 Jack M. Dampf and J. Michael McDonald, D'Amico, Curet & Dampf, Baton Rouge, for plaintiff-appellant.
Joseph Schittone, Jr., Downing, Cazedessus & Powers, Baton Rouge, for defendants-appellees.
Before EDWARDS, SHORTESS, and SAVOIE, JJ.
SHORTESS, Judge.
Lloyd Aguillard, Sr. (plaintiff) seeks damages for injuries suffered when he was struck in the eye by an object thrown from a bushhog[1] operated by Lester Langlois (defendant). Also made defendant is Langlois' liability insurer, State Farm Fire & Casualty Company.
On September 30, 1981, defendant took plaintiff to his pecan orchard. Plaintiff was to putter around while defendant cut grass. They had been good friends for eight or nine years. Plaintiff was an elderly man who enjoyed going to defendant's property where he raised a garden and sometimes helped defendant with minor work. The orchard was on an approximately 17.5-acre tract in Pointe Coupee Parish where defendant had planted 30 pecan trees approximately 90 feet apart. Defendant testified that the pecan harvest began the first week of October; therefore, he had to cut the grass under and around the trees to the shortest possible length to prepare for the harvest.
Defendant had been bushhogging for a little over an hour and was in the process of mowing around the last tree when he saw plaintiff approximately 40 to 50 feet away kneeling or crouching on the ground and holding his hand over one of his eyes. He immediately ran to plaintiff and discovered that he had been struck in the eye by an object thrown by the bushhog. Defendant took plaintiff to a local physician who cleaned and medicated his eye and referred him to Dr. Thomas E. Hebert in Baton Rouge. Plaintiff was hospitalized at Our Lady of the Lake Hospital for four days.
Plaintiff's version of the accident is substantially identical to defendant's. Plaintiff says he was walking 40 to 50 feet from the bushhog watching defendant work. He was struck in the eye by something that he did not see coming but stated it was a pecan because it "mashed" on his face, and parts of a mashed pecan fell down onto his arm.
The trial court rendered judgment dismissing plaintiff's claim. Plaintiff appeals, urging that the court erred in not finding defendant and State Farm liable for Langlois' negligence (LSA-C.C. art. 2315), or under a theory of strict liability (LSA-C.C. art. 2317).

STRICT LIABILITY OF DEFENDANT
The doctrine of strict liability of a landowner under LSA-C.C. art. 2317 for vices or defects in his property had its Louisiana origins in Loescher v. Parr, 324 So.2d 441, 446 (La.1976), wherein the Supreme Court said:
When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible ... for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect creates an unreasonable risk of injuries to others. (Emphasis added.)
Therefore, if we are to find defendant strictly liable for this harm, our inquiry must focus upon the unreasonableness of the risk of harm posed by the things in his custody, without regard to any negligent act or omission on defendant's part.
In determining whether the risk posed by a thing is "unreasonable," the courts "must consider the moral, social and economic values as well as the ideal of *1014 justice in reaching an intelligent and responsible decision." Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983).
[T]he activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations.
Entrevia, 427 So.2d at 1149, citing Langlois v. Allied Chemical Corporation, 258 La. 1067, 1084, 249 So.2d 133, 140 (1971).
We have thoroughly reviewed the record and conclude that the trial court did not err in finding no 2317 strict liability. Although a bushhog can be dangerous, it is by far the most common and practical method available for mowing large tracts of land covered with tall grass. Both the parties and the trial court recognized that this occurrence was unusual. Plaintiff was refreshingly candid with the court when he stated, "How in the world that pecan came out from underneath there, God knows, I don't know.... But I'd have never thought that the way that happened out there could happen." The trial court found this to be a "freak accident." We think that the small magnitude of the risk of injury from being struck in the eye by an object thrown 45 feet from a bushhog is outweighed by the onerous burden we would place upon landowners by requiring them to bushhog only when no one else was present on the land, or requiring them to scour every square inch of the land to be bushhogged in order to discover potential projectiles. When we balance the probability and magnitude of the risk against the social utility of the things involved, we conclude that neither the bushhog nor the land itself nor their concurrence in causing this accident posed an unreasonable risk of harm.

NEGLIGENCE OF THE LANDOWNER
The duty owed a plaintiff by a defendant in this situation is one of "reasonable and ordinary care." Mudd v. Travelers Indemnity Company, 309 So.2d 297, 302 (La.1975); Hendry v. Fire & Cas. Co. of Connecticut, 246 So.2d 347, 348 (La. App. 1st Cir.1971).
Defendant testified that on the day of the accident he had set the bushhog as low to the ground as it would go. He stated that when cutting grass at a low level, the bushhog tended to throw the grass farther than when cutting it at a higher level. That day it was throwing the grass eight to ten inches. Defendant further testified that he gave plaintiff no instructions on where to stand because plaintiff "wasn't a youngster, ... he knows what's going on." Defendant stated that he "looked back" toward the plaintiff just after the accident. He "couldn't say" for sure where the plaintiff was in relation to the bushhog at the exact time of the accident, although defendant knew that plaintiff was about 45 feet away from him at that time.
Although not unreasonably so, the operation of a tractor and bushhog when other people are near by is a dangerous undertaking. The operator must be on guard to a reasonable degree to avoid not only obvious risks of injury, such as running into someone, but also maneuvering the bushhog so as to suddenly expose someone to the possibility of flying debris. Gerald D. Whitehouse, a mechanical engineer whose deposition was introduced as a joint exhibit, was of the opinion that it would not be unusual to expect a bushhog to throw a pecan if it was lying in the high grass. When pressed further, Whitehouse said such an occurrence was "very likely" to happen. He did feel that he could not assign a safe range in feet because too many variables are involved, such as moisture of the grass. Defendant's testimony shows that he was not fully aware of plaintiff's position while operating the bushhog. This was despite his knowledge that the bushhog was on the lowest level, and if it picked up a solid object in the grass it would throw it farther than it would had the bushhog been set to a high cut. We find that defendant breached his duty of reasonable care to plaintiff and caused him *1015 damage, obligating him to repair it. LSA-C.C. art. 2315.

PLAINTIFF'S ASSUMPTION OF THE RISK
Plaintiff had been around bushhogs most of his life. He stated that he did not need defendant to warn him to be careful because "I knew it was dangerous." He testified, "I was watching from a long distance back because I didn't want to get too close to that. It's dangerous, you see."
It is evident from his testimony that plaintiff knew that there was a possibility the bushhog would throw a projectile; from his long acquaintance with bushhogs, he appreciated the risk of injury from being struck by one of the projectiles, yet by standing 45 feet away while facing the bushhog he voluntarily encountered the risk, however slight, that it might hurl an object to him. Thus, we find that plaintiff assumed the risk of his injury under the traditional "Assumption of the Risk" analysis set out by our Supreme Court in Dorry v. Lafleur, 399 So.2d 559, 562-63 (La.1981).
Traditionally, proof that plaintiff assumed the risk of his injuries has constituted a total bar to his recovery from a negligent defendant. Prestenbach v. Sentry Insurance Company, 340 So.2d 1331, 1335 (La.1976). This total bar has been extended to apply in strict liability situations. Lovell v. Earl Grissmer Company, Inc., 422 So.2d 1344, 1352 (La.App. 1st Cir.1982), writs denied, 427 So.2d 871 (La.1983); See also Brown v. Harlan, 468 So.2d 723 (La. App. 5th Cir.1985). However, in Bell v. Jet Wheel Blast, 462 So.2d 166, 172 (La.1985), the Louisiana Supreme Court stated that in strict products liability "the adoption of a system of comparative fault should, where it applies, entail the merger of the defenses of misuse and assumption of risk into the general scheme of assessment of liability in proportion to fault." (Emphasis added.) Even more recently, the court expounded upon the proper method of assigning proportions of fault under our pure comparative fault system. In Watson v. State Farm Fire & Casualty Insurance Company, 469 So.2d 967 (La.1985), a case involving contributory negligence, the Court took advantage of the opportunity to offer guidelines for apportioning fault under comparative fault:
"In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed."
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
[Quoting Uniform Comparative Fault Act § 2(b) (1977)]
The trial court in oral reasons stated that "the Court is torn between no negligence on either part or negligence totally on both parts." We, too, find it difficult to distinguish the nature of the conduct of these parties. Using the factors set forth in Watson, we find that the conduct of both men showed great awareness of the danger, and comparable inadvertence and assumption. The risk attributable to the conduct of both plaintiff and defendant was the sameinjury from a projectile. We cannot say that defendant's bushhogging activity was of little significance; nor were his "capacities" (presumably to avoid the accident) any greater than those of plaintiff in this situation. We find nothing in the record which we would term an "extenuating circumstance."
*1016 As for the causal relation between the conduct and the damages claimed, there is no question that the conduct of each party was a cause-in-fact of the injury. Likewise, the conduct of each was a proximate cause of the injury to equivalent degrees. The evidence presented requires an apportionment of 50% fault to plaintiff and 50% fault to defendant.

QUANTUM
Plaintiff was retired and 79 years of age at the time of trial. The evidence shows he led a very active, robust life prior to the accident and pursued many activities, including gardening, hunting and fishing. He also periodically drove from his home in New Roads to New Orleans to visit his son. The testimony also shows that since the accident plaintiff has engaged in none of the aforesaid activities. Plaintiff did admit that he does drive around New Roads running short errands.
Immediately after the accident, defendant took plaintiff to a physician in New Roads who cleansed plaintiff's wound and referred him to a specialist in Baton Rouge. Thomas Hebert, plaintiff's opthamologist, saw him on the date of the accident and admitted him to Our Lady of the Lake Regional Medical Center for observation and treatment. He remained in the hospital until October 4. Dr. Hebert found that plaintiff's right eye had sustained trauma from a foreign object. His diagnosis was diffused cornea edema along with inflammation and hyphema in the anterior chamber of the eye. Dr. Hebert treated plaintiff with eye patches and drugs, including antibiotics and Cortisone while he was in the hospital. He characterized the injury as painful because "there's more pressure. The eye is sensitive to light, tears a lot, and feels scratchy." On discharge, Dr. Hebert's diagnosis was dislocated lens and glaucoma secondary to trauma.
The dislocated lens has resulted in functional blindness of the right eye which is correctible with the use of a very strong soft contact lens. Dr. Hebert testified that it was very possible that the lens might become dislodged and require surgery in the future. He also testified that the traumatic glaucoma was well controlled with drops which are administered to plaintiff on a regular basis. He sees plaintiff often and has noted that plaintiff has difficulty with the contact lens. Because of his advanced age, plaintiff cannot handle the contact lens easily and loses the lens every three or four weeks. Dr. Hebert also testified that if surgery becomes necessary to remove the dislocated lens, his estimate of the total medical costs would be in the neighborhood of $5,000.00.
It is evident that this injury has had a profound impact upon plaintiff's life and will continue to affect him in the future. His activities have been curtailed. He has regular medical expenses for his glaucoma treatment and replacement contact lens, and additional surgery is likely. We set plaintiff's general damages at $40,000.00 and set future medical expenses at $5,000.00. Since defendant was 50% at fault, he and his insurer are responsible for one-half of these damages. Efferson v. State, through Dept. of T. & Dev., 463 So.2d 1342 (La.App. 1st Cir.1984), writs denied, 465 So.2d 722 (La.1985).
For the above reasons, judgment is rendered in favor of Lloyd Aguillard, Sr., and against Lester Langlois and State Farm Fire & Casualty Company, jointly and in solido for $22,500.00, together with legal interest thereon from date of judicial demand until paid. Costs are assessed one-half to plaintiff and one-half to defendant.
REVERSED AND RENDERED.
NOTES
[1] The bushhog in question is a rotary-type cutter. It is attached to a tractor which pulls it. Its ideal use is to cut grass, bushes, small trees, etc., from large tracts of land.