JOHN S. COVINGTON, Judge.
Peter F. Pleune, hereafter “Pleune”, appeals the District Court judgment which dismissed his suit against the Louisiana Department of Transportation and Development, hereafter “DOTD”, holding that the sole cause of the one vehicle accident was the host driver’s negligence. We affirm.
*1367 Pleune sustained severe injuries when the car in which he was a passenger collided with a large tree, causing the rear of the vehicle to lift up, rotate and come to rest in a “turtle back” position in the roadway with the front of the vehicle facing the direction from whence it had traveled. Pleune was trapped in the wrecked car; the host driver, William E. McCluskey, was thrown through the windshield and crushed to death by the car which landed on his chest.
Live testimony was given by Pleune, his treating physician, two physicians whose specialty is pathology, two experts in the fields of traffic engineering, highway design, and accident reconstruction, an economist, a substance abuse expert, a Crime Laboratory technologist, several law enforcement officers, and several lay witnesses. Several depositions, including that of Guy Otwell, M.D., the late coroner of West Baton Rouge Parish, were offered into evidence. The trial consumed several days. The Trial Judge took the matter under advisement on March 15, 1984 and gave his reasons for judgment on May 4, 1984. Judgment was signed May 14, 1984.
FACTS
William E. McCluskey, hereafter “McCluskey”, was driving his 1972 Mercury Capri automobile in a generally Easterly direction on La. Hwy. 989.1, in West Baton Rouge Parish, on February 11, 1980 about 1:30 p.m. He failed to negotiate a curve and collided with a large hackberry tree located 7½ to 8' from the traveled portion of the asphalt surfaced 18' wide roadway. At a point approximately 95' from the tree, which measured 3' in diameter, the McClus-key ear’s right front wheel strayed off the asphalt surface, about mid-way through the curve, and traveled from 35 to 50' along the dirt and grass shoulder before it either went into or straddled the ditch and struck the tree with the right front of the car. Pleune, a guest passenger, remembered only that “something yellow” flashed in front of him and the next thing he remembered was waking up in the emergency room of Earl K. Long Memorial Hospital in Baton Rouge. The automobile was yellow.
According to Pleune’s own testimony, at about 10:00 a.m. that fateful day, he and McCluskey, residents of different apartments in the same Baton Rouge apartment complex, who knew each other only casually, decided to go on a trip to visit some of McCluskey’s friends to see about getting a job at a facility at the end of La. Hwy. 989.1 which dead-ended at the Intercoastal Canal. The two purchased a six-pack of beer and a fifth of Nikolai vodka at a convenience store about 10:30 a.m. and each had one beer between Baton Rouge and a lounge in Ascension Parish, arriving about 11:00 a.m. During their half-hour stay at the lounge, McCluskey and Pleune each had one beer; they left the Ascension Parish lounge about 11:30 a.m. and drove to Morley’s Marina, a lounge adjacent to the Canal, arriving about 12:30 noon. Further, Pleune testified, when they left the lounge in Ascension Parish the vodka bottle had not been opened but while driving to Morley’s Marina at the end of La. Hwy. 989.1 both he and McCluskey “had a sip out of the vodka bottle” between Port Allen and Morley’s Marina and that is all the vodka either had consumed all morning. Pleune further testified, on direct, that during the 30 to 45 minute stay at Morley’s Marina he and McCluskey drank two beers each but denied seeing McCluskey either bring in or take out the vodka bottle or drink vodka or any other hard liquor in the lounge; he spent 10 to 15 minutes outside the lounge building looking at the boats in the Canal, a vantage point from which he could not see the yellow car in the parking lot; both left the lounge “between 1 and 1:30,” when the barmaid asked them to leave, and sat in McCluskey’s car “maybe ten minutes” before starting back to Baton Rouge. Pleune denied there was anything about McCluskey’s speech, gait, or mannerisms which were indicative of his inability to safely drive a motor vehicle. On cross examination Pleune admitted he was under the influence of alcohol but that he was in control of his faculties at the time he and *1368 McCluskey were at Morley’s Marina; while McCluskey was not “obviously” under the influence of alcohol plaintiff “knew he was because he had been drinking along with” plaintiff. However, Pleune denied either he or McCluskey had been drinking “straight shots” of vodka while inside Morley’s Marina. While admitting that he was influenced by alcohol, Pleune frankly stated “I was well aware of where I was and what I was doing.” Neither McCluskey nor Pleune had eaten any food from 10:00 a.m. onward; Pleune did not know whether McCluskey had eaten breakfast. During examination by the Court Pleune clarified the number of beers he and McCluskey had consumed; each had drunk four beers between 10:30 a.m. and shortly after 1:00 p.'m. McCluskey weighed approximately 200 pounds and Pleune weighed about 145 pounds.
The first law enforcement officer to arrive at the accident scene was Trooper Mil-lican of the Louisiana State Police; during the course of his investigation he noted the asphalt roadway of 18' wide in the curve and the dirt and grass shoulder was approximately 3' wide although the width varied from one place to another. He noted a “drop-off” measuring 1" to 2" between the asphalt surface and the dirt shoulder. The trooper stated further, that he observed within the car an intact liquor bottle, “at least half” full. The trooper added he detected “a faint scent of alcohol”; that “vodka is hard to detect on a person’s breath” and that the driver was dead when he arrived at the accident scene at 1:41 p.m. In preparing the accident report the trooper did not consider the “rut” or “drop-off” between the asphalt and shoulder as unusual or as a factor in the accident and he experienced no problems negotiating the curve in his patrol car. Trooper Milliean admitted that he had investigated “one or two” other accidents in the subject curve but that those accidents occurred when drivers tried to take the curve too fast and ran into the ditch, but not the tree, and simply required a tow-truck to pull the vehicles out of the ditch.
Dr. Olin K. Dart, a retired professor of engineering, testified as DOTD’s expert in the fields of traffic engineering, highway design, and accident reconstruction. Mr. Duaine T. Evans, at one time employed as a design engineer by DOTD, testified as Pleune’s expert in the same fields as Dr. Dart testified. Both agreed that the subject' curve was a 22°73" curve and that an advisory speed of 30 m.p.h. was too high. Mr. Evans opined that the maximum safe speed for negotiating the curve was 25 m.p.h.; the proper warning sign should have been a “turn” sign rather than the “curve” sign; and the warning sign and advisory speed sign should have been placed 750' from the beginning of the curve instead of the 280' the sign was actually placed. The first inspection of the roadway and shoulder was made by Mr. Evans about six weeks post-accident, on March 21, 1980. He measured the shoulder in the curve and found it to range from IV2' to 3' wide at a distance of 100' from the tree to the curve; he observed a rut 2" to 3" deep, in the shoulder, 140' from the tree and parallel to the asphalt surface but he did not state the length of the rut; the inside or nearest side of the tree was 8' from the edge of the asphalt surface. Mr. Evans determined that McCluskey had traveled 150 or more feet in the curve before his right front wheel went off the asphalt 95' from the tree and opined that the car traveled about 35' on the shoulder before going into the ditch which he determined to be 2 to 3' deep. Mr. Evans stated that DOTD’s own standards establish a maximum curvature of 5°30" on a Class IV road, such as La. Hwy. 989.1, and a minimum shoulder width of 8'. He opined that the “design deficiencies are worse than the warning deficiencies”; the design deficiencies were a substantial contributing factor in the accident sued upon; the dangers posed by the curve are not obvious on initially entering it and the driver does not have enough information to react appropriately “unless he’s familiar with it and has driven it before.”
Mr. Evans further opined that McClus-key’s consumption of alcohol played no *1369 part in the accident, stating that “a person who had no alcohol, that got off on this shoulder in the same manner, would have encountered the same problems and ended up in the same place” and if a drinking driver “was affected ... in his reaction time, ... that would [not] have affected the end result because it happened so quick.” On cross examination Mr. Evans stated that the speed of MeCluskey’s vehicle was 40 m.p.h. when it hit the tree and “his speed when he left the pavement would have been a little bit higher than when he reached the tree”; the highway design criteria are “based on reasonably prudent drivers”; and even if a maximum advisory speed of 25 m.p.h. for the curve had been placed on a sign as recommended in his testimony, “it wouldn’t matter” if a driver ignored the advisory sign and continued through the curve at 40 m.p.h. Mr. Evans remained staunch in his opinion that the 23° curve in a roadway 18' wide, “below standards” narrow shoulders, “improper” warning signs placed too close to the beginning of the curve, posting of a 30 m.p.h. advisory speed, and proximity of the tree to the edge of the asphalt roadway, taken in combination, presents an unreasonable risk of harm to the average prudent motorist.
The opinions Mr. Evans expressed regarding minimum width of travel lanes of Class IV roads and the maximum curvature were based on DOTD’s (1) standards for new construction and for major reconstruction, adopted April, 1977, and (2) minimum design standards for overlay or widening and overlay of rural highways and roads, adopted October, 1980. La. Hwy. 989.1 came into the state highway system in 1928 and DOTD’s predecessor graveled the road in 1931, blacktopped it in 1949, and did a complete asphalt overlay in 1977, the dates of letting the overlay contract and the performance of the contract not being reflected in the record. The average traffic count for La. Hwy. 989.1 in 1980 was approximately 1,300 vehicles in a 24 hour period.
Dr. Dart, a consulting civil engineer, visited the site in 1983 and determined that the curve in question measured 24° on the outside edge and 26° on the inside edge; the curve warning sign and 30 m.p.h. speed advisory sign, bearing the date March 21, 1979, were located 335' from his “estimated point of beginning of the curve”; in the curve the asphalt surface of the outer edge of the lane in which the McCluskey vehicle was traveling was V higher than the asphalt on the inner edge of the curve, termed “super-elevation”; McCluskey’s speed when the car hit the tree was between 40 m.p.h. and 50 m.p.h. and his speed in the curve was between 45 m.p.h. and 50 m.p.h.; the shoulder widths in relation to distance from the tree were (1) 6' at 95', (2) 4' at 80', (3) 3' at 60' and (4) “and it generally averaged right up to the tree.” The shoulder was constructed of a mixture of clay and gravel. The minimum width of shoulders for Class IV, or rural roads, as established by the American Association of State Highway Officials in 1954 for roads to be constructed after 1954, was stated to be 10' and the Louisiana minimum standard in effect for newly constructed roads and those undergoing “major reconstruction” in 1980 was 8' for Class IV highways.
The safe speed for the curve is, in Dr. Dart’s opinion, between 25 m.p.h. and 30 m.p.h. but a “properly alert and really trying” driver could, more than likely, “take that curve between 40 and 45 m.p.h.,” but, “that would be an absolute maximum, probably, on dry pavement.” He also opined that even if the advisory speed sign at the bottom of the curve warning sign had specified 25 m.p.h. the accident, sued upon would not have been averted because “the vehicle was traveling at an excessive speed for the curve, and due to the intoxication of the driver, he was unable to properly interpret what he should have seen and adjust his speed properly to make the curve”. While characterizing the curve as “severe,” Dr. Dart stated that a turn sign was not needed, a curve sign being adequate, and, in this instance, not too close to the beginning of the curve. He stated that the tree was 7½' from the edge of the asphalt roadway and the minimum horizontal clearance for trees was 18' for a Class *1370 IV road in 1980; although the accident sued upon would have happened even if the tree had been 18' from the asphalt edge, the accident would have been less severe because trees measuring 36" in diameter “tend to bring small automobiles to an abrupt lesser speed,” and, there was a concrete culvert in the ditch a few feet beyond the tree. Dr. Dart held firm his opinion that there was no reason why a reasonably prudent driver could not negotiate the curve by “driving within the advisory speed” of 30 m.p.h. which was posted an adequate distance from the beginning of the curve.
The parish Coroner removed blood from the dead driver, McCluskey, at the scene of the accident, for testing by the State Police Crime Laboratory. The blood alcohol level tested out to be .19, however, the laboratory test results were ruled inadmissible because no autopsy was performed on McCluskey.
Monroe Samuels, M.D., a toxicologist as well as a board certified clinical and forensic pathologist for more than 20 years, a professor of medicine at L.S.U. Medical Center, associate director of laboratories at Charity Hospital of New Orleans, and chief consulting pathologist for the Orleans Parish coroner, stated he had personally performed “in the range of 10,000” autopsies, and that, based on his actual experience, testified that organs are not always where they are supposed to be following the type of crushing injuries which killed McCluskey who was not wearing a seat belt. He opined that Dr. Otwell’s blood sample was not valid, elaborating that although Dr. Otwell’s intention was to draw heart blood, “it’s an unwarranted assumption to say that the heart is where the tip of your needle is going to because you have stuck it in the place in normal people now you’re sticking it in the same place in somebody who has evidence of chest and/or abdominal trauma and expect the viscera to be the same way.” Because no autopsy was performed it would not be possible, in Dr. Samuels’ opinion to determine whether the trauma McCluskey sustained ruptured the stomach, diaphragm, aorta and heart, the consequence of which could force the stomach contents, including unabsorbed alcohol, into the chest cavity from which the blood sample was drawn and produce a false blood alcohol reading. He stated that such combination of ruptures would not be unusual when extensive trauma, including crushing injuries, occur. Dr. Samuels confines his expertise in toxicology to poisonous compounds “which are most prevalent in the community, namely, the licit and illicit drugs and alcohol.”
Albert L. McQuown, M.D., a pathologist who practices in Baton Rouge, stated he was familiar with the effects of alcohol on people, defended the method employed by Dr. Otwell in obtaining the blood sample from McCluskey and opined the test results obtained were valid. He testified in detail concerning the effects of various amounts of alcohol on people in general. He stated that persons whose blood alcohol level is .10 lose finer motor skills (coordination) and “their sense of judgment”; a driver with a level over .10 is driving while intoxicated; over .10 a driver “get[s] diplopia, or they see two lines instead of one line when they’re driving,” experiences blurring of vision, and a retardation of their reaction time so that the driver has difficulty in driving correctly; a driver whose level approaches .10 experiences difficulty with physical-visual coordination, including locomotion and stability while standing. Additionally, a .10 level person tends to be careless and reckless. Dr. McQuown opined that an individual whose blood alcohol level is .19 “would ... be considered just plain drunk” and the “incoordination and ... judgment would be impaired to a further degree” than the .10 level person and cannot properly operate an automobile. At a level of .19, the ability to recognize danger is impaired because the inebriated person either misinterprets the information warning of danger or he thinks he can “get away from danger.”
In Dr. McQuown’s opinion, a person weighing between 190 and 200 pounds, McCluskey’s weight, would have a blood alcohol level of .10 “or more” if he con *1371 sumed six or seven drinks, each drink consisting of either a 10 or 12 ounce beer, 8 ounce glass of wine, 1.5 ounces of straight 86 proof liquor, or a combination of two or more of the beverages, within a two hour period. He further stated that for the same person to have a level of .19 he would have to consume nine or ten drinks of any of the alcoholic beverages stated previously-
On cross examination Dr. McQuown testified that the highest blood alcohol level occurs thirty or more minutes after one has had a drink as defined above. He stated further that persons with a .19 level are not “blind drunk”, but nevertheless would be weaving when they are walking “particularly if they were trying to walk between chairs or make turns.”
C.B. Reed, III and his wife Judy, went to Morley’s Marina after making an inspection trip to their camp in the swamp near the canal; they were there when McClus-key and Pleune arrived and when they left. Mr. Reed corroborated Pleune’s frank admission that he and his host driver, McCluskey, drank two beers each at Morley’s. Additionally, Mr. Reed testified that shortly after they arrived and began playing pool, McCluskey went to his car and brought a “half-full vodka bottle” into Mor-, ley’s and soon “drank two or three shots of vodka” directly from the bottle, emphasizing that the shots were “good shots” and that he was taking “a swallow of beer and a swallow of vodka.” Mr. Reed stated that he declined McCluskey’s offer to drink some of the vodka; instead, he informed McCluskey that Morley’s was licensed to sell only beer and that McCluskey should take the bottle back to his car. Mr. Reed observed that the vodka bottle was “a little more than a quarter full” when McCluskey and Pleune left the lounge after the barmaid asked them to leave. Further, Reed testified that McCluskey “staggered a couple of times” and also saw him “running a chair around a table” while walking between two tables. Reed opined his belief that “McCluskey ... was pretty loaded ... when he” arrived at Morley’s, basing his belief on his being “loud” and “a little overbearing” when he came up to Reed. On cross examination, Mr. Reed stated that no food was available at Morley’s except “maybe some potato chips and dry stuff like that,” but added that he “didn’t see them eat anything while they was there.”
Mr. Reed stated that he traveled La. Hwy. 989.1 “two, three, four times a week” regularly and almost every day during hunting season and that he “never had no trouble with the curve” although he has “been driving it for 20 -years” because “I stay on my side of the road in the curve,” although he had noted most people he saw approaching the curve have a tendency to cross the double yellow lines in the curve.
Judy Reed testified that she and her husband arrived at Morley’s “after 12 o’clock” noon and McCluskey and Pleune arrived later; McCluskey and Pleune remained “close to an hour”; when the two men arrived at Morley’s they each “ordered a beer and ,.. played pool for awhile” before she noticed a bottle of vodka “on the table” although she did not see who brought it inside Morley’s; observed McCluskey drinking vodka straight from the bottle “one time” before he “eventually took it out” of the building, at which time “he was kind of unsteady on his feet,” which, in combination with his being “noisy, loud, annoying and obnoxious,” gave her the overall impression that McCluskey was “very drunk.”
Margaret Bishop, operator of Morley’s in 1980, testified, on cross examination, that the superintendent of the shipyard, the facility located at the end of the road adjacent to the canal, told her “the day he [McCluskey] got killed ... that he had come down there that day to see if he could go back to work” at the shipyard where “he worked ... several years ago.” The hearsay nature of the testimony was not objected to.
Linda Cochran, the barmaid at Morley’s, testified that when McCluskey and Pleune arrived at Morley’s she served each of them a beer and shortly thereafter she saw McCluskey go outside and bring in a bottle *1372 of vodka and saw each man take one drink from the bottle “while they were inside the place.” Ms. Cochran observed that when McCluskey “walked out to the restroom he sort of staggered to go around the corner” and based on that observation, combined with his “loud talking and vulgarity,” believed McCluskey was intoxicated, although she “didn’t think they were highly, highly drunk” when she served them beer. It was her recollection that she served them only one beer each, or one less than Pleune admitted that each man had consumed at Morley’s.
DISTRICT COURT
In written reasons for judgment, the Trial Judge addressed the matter of alcohol consumption and its effects on McCluskey, the host driver, as follows:
Our jurisprudence establishes that in a civil action there is no presumption of intoxication based on blood alcohol level. The blood alcohol level is just another fact the trier of fact can use in determining the degree of McCluskey’s impaired driving ability in considering the affirmative defense of assumption of risk by Pleune. The Court does not find that the blood alcohol test is admissible as evidence, however, considering the lay testimony, the Court believes McCluskey’s driving ability was impaired by the consumption of alcohol.
Regarding the duty owed to motorists, the Trial Judge reasoned, in pertinent part, as follows:
The Highway Department has a duty to maintain a reasonably safe highway for the protection of those people who could foreseeably be placed in danger by an unreasonably dangerous condition. That duty encompasses an obligation to provide and maintain an efficient and continuous system of all state highways. It must make safe any defect of the system of which it has or should have knowledge. The department is liable for damages when it is shown that the hazardous condition that caused the injuries was patently or obviously dangerous to the reasonably careful driver and the department, with actual or constructive knowledge, failed to correct the defect within a reasonable time.
However, the failure of the state to update its highways to the current standards does not establish the existence of a dangerous defect. To impose a burden upon the state of having to update its thousands of miles of highway within the latest guidelines would be an impossible one to fulfill. Further, it is well settled that the highway department is not an insurer of the safety of all motorists on the roads, but has the obligation to maintain the roads and highways in a reasonably safe condition for a reasonably prudent driver. Sinitiere vs. Lavergne, 391 So.2d 821 (La.1980); Devall v. Morgan, 424 So.2d 522 (La.App. 5th Cir.1982), writs denied [427 So.2d 1214] March 4, 1983.
A defect [for purposes of determining liability under either C.C. art. 2315 or 2317] is some flaw or fault existing or inherent in the thing itself that creates an unreasonable risk of harm to others.
Despite the age of this highway, there was no evidence that other accidents had occurred in the curve. In determining whether the alleged defect, i.e., advisory sign, speed sign, and their location, the width of the highway in the curve, the curvature of the curve, the width of the shoulders and location of the tree in proximity to the highway, the test must be made in relationship to the ordinary reasonably prudent driver.
This Court does not believe the alleged defects constituted any unreasonable risk of injury to the ordinarily prudent driver. Further this Court finds that the cause of the accident was McCluskey’s excessive speed in trying to negotiate a curve that was not designed for this excessive speed. The Court was impressed with the testimony of .Mr. Evans and Dr. Dart relative to McCluskey’s estimated speed at impact with the tree and the *1373 distance the vehicle was airborne after the impact.
ASSIGNMENTS OF ERROR
Plaintiff-appellant, Pleune, assigns as manifest errors the Trial Court’s:
1. failure to hold that the combination of curvature and width of the road, narrow shoulders, ditch, tree, type and location of signs, and the advisory speed for the curve, constituted a defect posing an unreasonable risk of harm to a reasonably prudent driver;
2. holding the fault, if any, of the driver relieved DOTD from liability for the guest passenger’s injuries;
3. holding the sole cause of the accident was McCluskey’s speed;
4. imputing McCluskey’s negligence, if any, to the guest passenger; and
5. holding DOTD proved assumption of risk and that the sole cause of the accident was the fault or negligence of a third person.
ISSUES
The issues presented to us are whether (1) under the totality of circumstances, the curve constituted a defect which posed an unreasonable risk of harm to the reasonably prudent motoring public, (2) the fault, if any, of the driver relieved DOTD from liability for the guest passenger’s injuries, (3) the sole cause of the accident was the driver’s actions and condition, (4) the host driver’s negligence, if any, is imputable to the guest passenger and (5) whether the defenses of assumption of risk and third party fault were proved.
PHYSICAL FEATURES OF THE ROAD, SHOULDER AND SIGNS
As stated earlier in the statement of facts, Dr. Dart and Mr. Evans expressed opposing opinions as to the nature of the roadway, curve, shoulders and posted advisory speed. Dr. Dart opined that, under the totality of circumstances, the curve did not present an unreasonable risk of harm to a reasonably prudent driver who negotiates the curve “within the advisory speed” of 30 m.p.h. although he would have preferred an advisory speed of 25 m.p.h. Mr. Evans, in sharp contrast, opined that any curve in excess of 5°30" poses an unreasonable risk of harm to a reasonably prudent motorist but the risk can be minimized by posting a 25 m.p.h. advisory speed sign 750' from the beginning of the curve, widening the roadway from 18' to 20' or more, constructing shoulders at least 8' wide' and removing the tree. Mr. Evans’ stated preference for “curing” the conditions he characterized as “defects of design” was for DOTD to acquire additional right of way “in the cane field” on the left side of the road and reconstruct that portion of the road to straighten out the curve which both he and Dr. Dart characterized as “severe.” Dr. Dart and Mr. Evans differed sharply on the role of the driver’s consumption of alcohol in this accident. Mr. Evans opined that alcohol played no part in the accident because the vehicle entered the curve in excess of 40 m.p.h., the advisory speed was 5 m.p.h. more than it should have been, the speed advisory sign was approximately 500' closer to the beginning of the curve than it should have been, and the proper sign to warn motorists about the upcoming curve was a “turn” sign instead of a “curve” sign. Dr. Dart opined that an advisory speed sign of 25 m.p.h. would not have averted the accident because the driver entered the curve at an excessive speed “for the curve” and the alcohol he had consumed rendered him “unable to properly interpret what he should have. seen and adjust his speed accordingly to make the curve.” Dr. Dart’s views regarding the effects of alcohol on a person’s ability to drive a vehicle were corroborated by Dr. McQuown, and pathologist.
The District Court’s finding that “McCluskey’s driving ability was impaired by the consumption of alcohol” is supported by the testimony of lay witnesses and a medical doctor, DOTD’s expert in the field of pathology.
In Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200 (La.App. 1st *1374 Cir.1982), writ denied, 429 So.2d 133 (La.1982), stated the standard for assessing expert testimony, in pertinent part, as follows:
The finder of fact, be it judge or jury, should assess the credibility of witnesses, expert or lay, to determine the most credible and realistic evidence.... In reaching conclusions, the finder of fact need not accept all of the testimony of any witness as being true or false and may believe and accept a part or parts of a witness’ testimony and refuse to accept any part or parts thereof_ The opinions of expert witnesses are not binding on the finder of fact and are to be weighed the same as any other evi-dence_ The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based.... The fact finder’s evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong. (Citations omitted.) 422 So.2d at 1203-1204. ACCORD: Hayes v. Commercial Union Assurance Co., 459 So.2d 1245, 1250 (La.App. 1st Cir.1984), writ denied, 462 So.2d 1247 (La.1985).
In Galloway v. Gaspard, 340 So.2d 579 (La.App. 1st Cir.1976), we reiterated that “a trier of fact is not required to accept the unrefuted testimony of an expert witness; he may substitute his own common sense and judgment for that of an expert where, in the opinion of the trier of fact, such substitution appears warranted by the evidence as a whole.” 340 So.2d at 583.
After examining the testimony of both experts in the . fields of traffic engineering, highway design and accident reconstruction, we cannot say the Trial Court abused its great discretion by choosing one expert over another. The Trial Court’s finding that the factors of width of the highway in the curve, the degree of curvature, the width of the shoulders, the type of location of the advisory and speed signs and the proximity of the tree to the asphalt roadway, in combination, did not constitute an unreasonable risk of injury to the ordinarily prudent driver, therefore not a defect within the intendment of Article 2317 of the Civil Code and the jurisprudence interpretive of it, is not manifestly erroneous and we will not disturb it. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Plaintiff-appellant cited in oral argument Tischler v. City of Alexandria, 471 So.2d 1099 (La.App. 3d Cir.1985), as authority for the proposition that the 1" to 2" rut or “drop-off” parallel to the asphalt surface of La. Hwy. 989.1, in the area where McCluskey’s right front wheel first left the roadway, is a defect which imposes liability on DOTD. Reliance on Tischler is misplaced; it is factually inapposite. In Tis-chler “the roadway [was] a two-laned narrow winding asphalt road with very narrow shoulders and large ditches on both sides.” 471 So.2d 1101. The similarity of it to the-present case ends there. The shoulder in Tischler was 6 to 8" lower than the roadway; a utility pole was located in the shoulder 41" from, the edge of the roadway; the accident happened in the rain at night when the driver, not influenced by alcohol, had his view of the road obscured by the combination of the “bright lights of an oncoming vehicle” and the rain, causing the dual rear wheels of the motor home to leave the roadway and drop onto the shoulder. The Court held that “it was the drop-off in the immediate area coupled with the proximity of the utility pole which rendered the shoulder defective” and that “the location of the utility pole was the sole reason why Dr. Tischler was unable to complete reentry onto the roadway,” thus finding no victim fault although the driver was about 200 feet from the driveway of the residence he had occupied for 13 years before the accident.
Appellant’s first assignment of error is without merit.
HOST DRIVER’S NEGLIGENCE
The Trial Court found that “McClus-key’s driving ability was impaired by the consumption of alcohol” and that his “trying to negotiate a curve that was not de *1375 signed for this excessive speed” was the cause of the accident. The overwhelming weight of the testimony supports both findings. Several witnesses saw the vodka bottle before and after the accident. After the accident several law enforcement officers depicted the bottle as being “over half full,” a little less than one-half full, between one-fourth and one-half full; they were basing their approximations on a bottle lying down rather than standing. C.B. Reed, III, a disinterested witness, as were the police officers, observed McCluskey bring into Morley’s a vodka bottle one-half full and take out a bottle one-fourth full when he and Pleune left and observed him drink two or three “good shots” from the bottle, alternating between a “swallow of beer and a swallow of vodka” just a few minutes before the accident. The lay testimony, including Pleune’s, regarding the alcohol McCluskey had consumed between 10:30 a.m. and about 1:15 p.m., bolstered by Dr. McQuown’s opinion that “nine or ten drinks” would produce a blood alcohol level of .19 in a person weighing 190 to 200 pounds, McCluskey’s weight, supports the Trial Court’s finding that McCluskey’s driving ability was impaired. The record reflects that it is more probable than not that McCluskey had consumed sufficient alcohol to have a blood alcohol level of .19, even without the results of the test conducted by the Crime Laboratory. Dr. McQuown painted a picture of a person who had consumed enough alcohol to produce a level of .19, or “just plain drunk,” with resulting loss of coordination, judgment, ability to recognize danger and ability to interpret information warning of danger. In so doing he painted a perfect likeness of McClus-key.
Appellant’s second and third assignments of error are without merit.
IMPUTED NEGLIGENCE AND AFFIRMATIVE DEFENSES
Pleune admitted he had consumed four beers between 10:30 a.m. and about 1:15 p.m., in addition to a “sip” of vodka shortly before 12:30 p.m., and by his further admission, “was well aware of where [he] was and what [he] was doing” when they left Morley’s to go to the car and that while, in his estimation, McCluskey was not “obviously” under the influence of alcohol, Pleune knew that he was because they had been drinking together.
In Everett v. Louisiana Department of Transportation and Development, 424 So.2d 336 (La.App. 1st Cir.1982), we stated as follows:
The law is well settled in Louisiana that a “guest passenger riding with a driver who has been drinking excessively assumes the risk of injuries received in an accident caused in whole or in part by the driver’s negligence, ‘if the alcohol-induced impairment of the driver’s ability is a substantial contributory cause of the driver’s negligence’ and if the guest passenger ‘knows or should have known’ of the driver’s condition and nonetheless voluntarily rides with him.” ... The defendant bears the burden of proving by a preponderance of the evidence that the driver’s intoxication was a “substantial factor” contributing to the accident.... 424 So.2d at 342. (Emphasis supplied.)
The record supports the conclusion that Pleune voluntarily assumed the risk of injury by voluntarily riding with a drinking companion whom he knew to be under the influence of alcohol. The record also amply supports the Trial Court’s finding that McCluskey’s trying to take the curve at an excessive speed was the sole cause of the accident and his negligence was attributable to alcohol impaired ability to drive. The Trial Court was not clearly wrong in holding that the physical attributes of the accident scene played no substantial part in the accident.
The fourth and fifth assignments of error are without merit.
The judgment of the District Court is affirmed. Plaintiff-appellant is cast for all costs in this Court and in the District Court.
AFFIRMED.