483 So.2d 1063 (1985)
Karen MYERS, Individually and as Administratrix of the Estate of Her Minor Son, Samuel Todd Rodgers
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and Les Reynolds.
No. 84-CA-1171.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
Dissenting Opinion January 9, 1986.
On Rehearing March 5, 1986.
Writ Granted May 1, 1986.
*1064 Joseph Olinde, Jr., Baton Rouge, for plaintiff-appellee Karen Myers, Individually and as Administratrix of the Estate of her minor son, Samuel Todd Rodgers.
Lawrence A. Durant, Baton Rouge, for defendant-appellant State of La., through Dept. of Transp. & Development.
Paul Marks, Baton Rouge, for defendant-appellee State Farm Mut. Auto. Ins. Co.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
EDWARDS, Judge.
From a judgment in favor of the plaintiff the Department of Transportation and Development appeals.[*] We affirm.
This suit arose out of an automobile accident in which eleven-year-old Samuel Todd Rodgers was severely injured when the Honda automobile in which he was a passenger crashed into a tree on the side of the road. The driver of the Honda was Todd's friend, Donnie Brister, who was home on leave from the Navy. Very early on the morning of November 1, 1981, Donnie and Todd were traveling on Louisiana State Highway 37, Greenwell Springs Road, on their way to go squirrel hunting.
According to Donnie Brister, to avoid a collision with an oncoming car which was approaching him in his lane of travel, he veered to the right, slid into a ditch, lost control of his vehicle, and ultimately struck a large oak tree located in the ditch. Todd did not remember anything about the accident. The oncoming motorist did not stop and was never identified. There were no witnesses.
The DOTD argued that Donnie Brister simply went to sleep and ran off the road. The trial court, however, found that the accident occurred as a result of Donnie Brister performing an evasive maneuver, and accordingly concluded that Brister was not negligent. The court then apportioned fault for the accident: 75% to the unidentified oncoming motorist, and 25% to the DOTD. The oncoming motorist, who is liable in solido with the DOTD, was not a party to the suit, and consequently the court cast the DOTD for the entire award, mentioning DOTD's right to contribution. See LSA-C.C. art. 1804. The DOTD appealed, seeking to have the judgment against it reversed, or alternatively, a reduction in the amount of the judgment. Plaintiff answered, seeking an increase in the general damages award.

LIABILITY
We have reviewed the record and have found no manifest error in the trial court's fact finding as to how the accident happened. See Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). It follows then that Brister was not negligent, and therefore is not liable for damages. For the following reasons we also agree with the *1065 trial court's conclusion that the DOTD was 25% at fault.
The Department of Transportation and Development has a duty to provide and maintain its roadways in a reasonably safe condition, and that duty extends to those who must drive onto the shoulder because of an emergency condition. Sinitiere v. Lavergne, 391 So.2d 821, 823 (La.1980). This court recently held the DOTD liable for damages when a car struck a utility pole located on the shoulder of a State highway, notwithstanding the driver's negligence. See Lang v. Prince, 447 So.2d 1112 (La.App. 1st Cir.), cert. denied, 450 So.2d 1309 (La.1984).
At the point where the accident occurred, Louisiana State Highway 37 is a two-lane road, each lane being twelve feet wide, with a shoulder of one to two feet which quickly slopes into a two and one-half foot deep ditch. The speed limit is 45 miles per hour. A tree three and one-half feet in diameter was located in the ditch, nine feet from the edge of the paved roadway.
The highway design standards of the American Association of State Highways and Transportation Officials represent the general practice in the profession. Defendant's expert testified that the DOTD, which is represented in AASHTO, accepts AASHTO's guidelines as minimum standards, and when possible exceeds those standards. According to plaintiff's expert, AASHTO's standards for the class of highway in which Highway 37 is categorized recommend shoulders ten feet wide, but allow six foot shoulders as an absolute minimum. Plaintiff's expert also testified that the slope of the ditch was too steep, being two horizontal units to one vertical unit, compared with the minimum acceptable slope of four horizontal units to one vertical unit. Finally, plaintiff's expert stated that the horizontal clearance measured from the outside edge of the paved roadway should be thirty feet, rather than the nine feet that existed.
Defendant's expert testified that because this was an old highway (initially paved in 1939), which had only been widened and overlaid in 1958 and again in 1977, the AASHTO standards for new construction and major reconstruction do not apply. According to defendant's expert, the DOTD's standards for overlay projects require that the existing horizontal clearance be maintained, and that the shoulder width be that which is necessary to maintain the existing crown of the road.
It is true that the DOTD is not required to constantly update existing roads to comply with present day new construction standards. Yet on this road, the shoulders are narrower and the horizontal clearance is less now than when the road was initially paved. Each time the road was resurfaced, the paved portion was widened but no other work was done, so that the shoulders became progressively narrower, shrinking from approximately four feet to the present width of one to two feet. The horizontal clearance likewise decreased as the paved roadway became wider.
The experts agreed that the desirable horizontal clearance is thirty feet, and that the desirable slope for the ditch is six to one, but that the minimum acceptable is four to one. Both experts likewise agreed that the tree presented a hazard because it was so near the roadway.
The State had been on notice that this road was unsafe since 1978 when it received a petition from the employees of the Greenwell Springs Hospital. The petition stated:
Many wrecks have taken place and at least one death has occurred. There is no place to go if you are run off the road except in a ditch several feet deep. About 300 people work here and there are many visitors. We also have emotionally disturbed children who sometimes get away and might run into the road.
If the road only had a wide shoulder it would be much safer. A stop light, caution light, change in the speed limit, and/or enforcement of the existing laws would probably help this situation.
The problem is getting increasingly worse. If something isn't done we will *1066 have more accidents and possible deaths in the future. Gravel trucks use this road constantly. Although the present speed limit is only 45 MPH, a gravel truck cannot stop immediately, especially when it comes around a curve at 45 or 50 MPH and a vehicle or a person is right there.
The combination of the narrow shoulder, the steep incline of the ditch, and the tree located in the ditch made the road unsafe for motorists such as Donnie Brister, who, because of an emergency situation, must drive off the road. Accordingly the DOTD breached its duty to maintain its roadways in a reasonably safe condition, and that breach was partially responsible for this accident because Brister did not have a safe zone in which to maneuver his car under emergency conditions.

DAMAGES
At the time the suit was filed, Todd's medical expenses totaled $9,500. By the time of the trial, two years later, the total had risen to approximately $15,500. Todd Rodgers sustained serious facial injuries in this accident, leaving him with permanent scarring over one-half of his head. He has already undergone five reconstructive surgeries and the record clearly establishes that more reconstructive surgery will be necessary, perhaps another four or five operations. Accordingly the trial court's award of $35,000 for past and future medical expenses is certainly not unreasonable.
Likewise the general damages award of $50,000 is within the trial court's discretion, and accordingly will not be disturbed. See Reck v. Stevens, 373 So.2d 498 (La.1979). For the foregoing reasons the judgment of the trial court is affirmed at the DOTD's cost of $1,592.02. See LSA-R.S. 13:5112.
AFFIRMED.
LANIER, J., dissents and will assign reasons.
LANIER, Judge, dissenting.
I dissent from the majority opinion because (1) it imposes upon the State a duty which may be physically and financially impossible to comply with, and (2) it fails to hold the host driver negligent.

DUTY TO HAVE A SAFE ZONE OFF ROADWAY (SHOULDER)[1] TO MANEUVER UNDER EMERGENCY CONDITIONS
The majority holds the State (DOTD) liable with the following rationale:
The combination of the narrow shoulder, the steep incline of the ditch, and the tree located in the ditch made the road unsafe for motorists such as Donnie Brister, who, because of an emergency situation, must drive off the road. Accordingly the DOTD breached its duty to maintain its roadways in a reasonably safe condition, and that breach was partially responsible for this accident because Brister did not have a safe zone in which to maneuver his car under emergency conditions.

[Emphasis added].
The practical implications of the imposition of this duty could be awesome.
The evidence indicates that in about 1927 the State obtained a right-of-way for Louisiana Highway 37, which is also known as the Greenwell Springs Road. In 1939 two 9 foot lanes of roadway were paved. In 1958 the roadway was resurfaced into two 10 foot lanes and had 3 foot gravel shoulders. In 1977 the roadway was again resurfaced to have two 12 foot lanes with 1 foot shoulders. The parties stipulated that the tree which was struck by the Brister vehicle "was there when the first known construction was commenced on Greenwell Springs Road and it has been in the same position ever since."
William Hickey, Project Development Engineer for DOTD for 22 years, gave the *1067 following testimony concerning this roadway:
Q Now, would you kindly differentiate between overlay and new construction or major reconstruction?
A In an overlay project, we generally work on the crown of the road itself.
Q Okay.
A In reconstruction, a higher-type standard is applied, shoulders are widened, lanes are widened if necessary, ditches are moved further out away from the road, if that's necessary, new right-of-way is generally acquired because of wider sections, fatter slopes, and things that the new standards require.
Q Has there been, to the best of your knowledge, any major reconstruction done on Greenwell Springs Road north of that portion which has been previously four-laned?
A No.
Q If that tree, which is where this collision occurred, had been in existence in that ditch in 1927 and in 1939 and in what was it? 1958?
A Yes.
Q and 1977, you would not have removed that, would you?
A No, would not.
Q And none of your standards that you have call for the removal of that tree or any other tree as far as that's concerned?
A No.
....
Q Now, to the best of your knowledge, at each time there was construction on Greenwell Springs Road, did it go forward pursuant to the plans and specifications that were drawn up for that particular work?
A Yes, it did.
Q Did they comply with all the standards necessary for construction or rather overlay or whatever they were doing at that time?
A Yes; they met the applicable standards.
The majority concedes "the DOTD is not required to constantly update existing roads to comply with present day new construction standards." See also Dagnall v. Louisiana Department of Highways, 426 So.2d 276 (La.App. 4th Cir.1983), writ denied, 433 So.2d 160 (La.1983); Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4th Cir.1981), writ denied, 404 So.2d 1259 (La.1981); Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La. App. 3rd Cir.1974), writ refused, 309 So.2d 341 (La.1975). Although the parties stipulated the tree existed prior to the construction of the roadway and the testimony of Hickey shows the roadway was built in accordance with prevailing standards, the majority finds the failure of a State road (and by analogy a parish road and a city street) to "have a safe zone in which to maneuver ... under emergency conditions" is fault.
Hickey described the Greenwell Springs Road and what procedures would be necessary to reconstruct it as follows:
Q Thank you. Mr. Hickey, as one leaves the four-lane portion of Greenwell Springs Road and proceeds north, is the entire length of Greenwell Springs Road lined with trees relatively close to the edge of the road?
A It generally has the same appearance throughout its length, yes.
Q And are all the shoulders about the same width?
A Some places they may be a little wider but generally that's about the
Q And where there aren't trees, are there culverts and driveways?
A Yes, there's quite a few of those.
Q And in the event you had to clear out all of the hazards to comply with a 30-foot clear zone, all of these would have to be removed and a new right-of-way would have to be acquired, is that correct?
A That's correct.
Q And we would then be talking about major reconstruction?
A Yes, that's correct.

*1068 Q How would you describe Greenwell Springs Road? Is it a major road, an arterial road, a farm-to-market road, or what is it?
A I believe it's classified as a rural collector.
Q A rural collector road. And what is that?
A That's just a classification assigned to the highways in the State, either arterial or collector. Arterials connect major metropolitan areas of 50,000 or more; collector roads are all the other State highways that provide access to the arterials and to smaller towns.
....
Q Now, in order to do major reconstruction on Greenwell Springs Road itself, what would be necessary exactly, considering Greenwell Springs Road, the way it is today?
A To meet current standards with the design speed and the traffic on that road, it would generally take almost a complete realignment. There's quite a few sharp curves that would have to be straightened out. Generally, it would require a substantial amount of right-of-way, a lot of property, developed property, would be affected by it; probably about the only option would be to relocate the road entirely but with the development of subdivisions in that area it would be awfully difficult to get right-of-way to do that without great expense.
Q But it can be done?
A Yes, it could be done.
Q Whenever a new standard comes out for reconstruction or new construction, is the Highway Department able to bring up its roads and highways to those new standards?
MR. PONDER: I object, Your Honor, I don't believe Mr. Hickey is qualified to answer that question.
THE COURT: I believe he can.
BY THE COURT:
Q How do you feel about it?
A Any time a road is improved, reconstructed, it's reconstructed to the current standards. I don't think that it would be physically possible or financially feasible for the State to bring every road that's not up to certain standards up to those standards.

BY MR. DURANT:
Q You're familiar with the process involved in having a road either constructed or going through major reconstruction, are you not?
A Yes, I am.
Q Would you explain to the Court what those procedures are?
A Each year the Department has a team that evaluates every highway in the State, Highway Needs Study Group, evaluates the highways, comes up with what improvements need to be made to each highway, which items of it are not standard and which items need to be improved. Then all these various classification highways, if it's an urban arterial or rural arterial, or collector, these various types of highways are all ranked against each other, and the improvements are done on them by priority order. Now, once the Department comes up with a list of projects then a public hearing is held in each highway district around the State to get input from the people in the districts plus a legislative delegation also has their input into it. At that point, a final program is submitted to the Legislature, which funds it, whatever amount of money they want to put into the program to do whichever jobs they want to get done that are on that priority listing. Now, once the Legislature approves that list, they have to approve taking the job off the list. In other words, one individual can't get a job taken off the list. A whole legislative committee again has to say, Yes, we'll take that project off or No, we won't. But it's a legislative process.
Q Okay. And once it's approved, then what happens?
A At that point, the Department is authorized to start the engineering work *1069 on the project, which includes a survey, design of the project, if it's got federal money in it, then all the public hearings that go along with it. The plans are completed, the right-of-way is established, the right-of-way is appraised, the Department purchases the right-of-way and then the contract is let.
Q How long generally does that procedure take?
A It takes approximatelyfrom the time a project is approved by the Legislature until plans are ready for the road to be built, approximately five to six years.
[Emphasis added].
The evidence in the instant case does not indicate the shoulder of Greenwell Springs Road is defective at the scene of the accident; the ditch in which the tree is located is not part of the shoulder. La.R.S. 48:1(20), (21) and (22).[2] The question at issue in this case is whether a State (and by analogy parish and municipal) roadway must have a shoulder which provides "a safe zone in which to maneuver ... under emergency conditions."[3] Hickey's testimony indicates that the legislature in past years has not required DOTD to provide such shoulders on all the roadways of the State, nor has it appropriated the money to comply with such a duty. Assuming this lack of action does not evidence a legislative intent, to determine the scope of the duty imposed on the State (through DOTD) a "judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community." Entrevia v. Hood, 427 So.2d 1146, 1149-1150 (La.1983). All rules of conduct (duties), whether legislative or jurisprudential, are designed to protect some persons under some circumstances against some risks. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). The majority opinion does not reflect that this analytical process was followed in defining the duty imposed on the State herein.
The basic purpose of a roadway is to provide transportation of persons, goods and/or services from one place to another. Roadway access to a geographical area results in business, residential and/or recreational development. Obviously, it is morally and socially desirable for all Louisiana roadways to have shoulders which provide safe zones to maneuver under emergency conditions. If such were provided, accidents, injuries and even deaths will be avoided. However, apparently in the past the legislative and executive branches of Louisiana's State government have designed, funded and built roadways which did not have shoulders that had safe zones to maneuver under emergency conditions. This indicates a legislative and executive determination that the social utility of having roadway access to an area outweighed the risks involved in not having such shoulders. Thereafter, whenever funding was available to update the roadway to present standards, such was done.
In defining and/or establishing a duty, the court should consider economic factors as well as social and moral factors. Entrevia, 427 So.2d at 1149-1150. The economic considerations are particularly pertinent herein because the majority is applying a duty retroactively; the State (and parishes and municipalities) may be bound to comply with a duty (standard) which was not prevailing when the roadway was built. The record presently before us does not reflect (1) how many miles of State (or parish and municipal) roadway will be affected, (2) the cost of obtaining servitudes or title to comply with the duty, (3) the cost of reconstruction *1070 of the roadways to comply with the duty, (4) the approximate number of accidents that would be avoided by compliance, or (5) the effect of allocating compliance costs on the ability of the State to provide other essential services. These factors are critical. Failure to consider these factors could result in severe consequences for the State and/or the public.
If the State (parish or municipality) does not have the economic resources to comply with the duty, what alternatives are available to it? It can either close the roadway or continue to operate it. If the first alternative is selected, the results could be catastrophic for the owners of residences and businesses. If the second alternative is selected, what is the exposure to liability and how will this exposure affect the ability of the State to provide other essential services. If the State does not have the economic resources to comply with the duty, (1) how long will compliance take, (2) what will be the exposure to liability in the interim and (3) what effect will the interim exposure and cost of compliance have on the ability of the State to provide other essential services? The duty established by the majority should have been imposed only "after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of the harm, and a consideration of individual and societal rights and obligations." Entrevia, 427 So.2d at 1149. Cf. Aguillard v. Langlois, 471 So.2d 1011 (La.App. 1st Cir.1985), writ denied, 476 So.2d 356 (La.1985). Such was not done in the instant case. There are insufficient facts of record to properly determine if the duty should be imposed. Prosser and Keeton, The Law of Torts, § 37, pp. 235-238 (5th ed. 1984). This case should be remanded for taking evidence of the economic consequences of imposing the duty so that a proper balancing of moral, social and economic considerations can be made.
In addition, I am unable to distinguish the instant case from the case of Pleune v. State of Louisiana, through the Department of Transportation & Development, 481 So.2d 1365 (La.App. 1st Cir.1985), which was decided by this panel of this court on the same day as the instant case (December 26, 1985). In Pleune, a host driver and guest passenger, who had been drinking together, were proceeding on a State roadway when the host driver lost control of the vehicle in a curve, ran into a roadside ditch and struck a tree in the ditch. The tree was located 7½ to 8 feet from the traveled portion of the roadway. The trial court rejected the claim of the guest passenger against DOTD. On appeal to this panel of this court, the guest passenger assigned the following error (among others):
[F]ailure to hold that the combination of curvature and width of the road, narrow shoulders, ditch, tree, type and location of signs, and the advisory speed for the curve, constituted a defect posing an unreasonable risk of harm to a reasonably prudent driver; ...
This panel of this court quoted from the trial court reasons for judgment, in pertinent part, as follows:
However, the failure of the state to update its highways to the current standards does not establish the existence of a dangerous defect. To impose a burden upon the state of having to update its thousands of miles of highway within the latest guidelines would be an impossible one to fulfill. Further, it is well settled that the highway department is not an insurer of the safety of all motorists on the roads, but has the obligation to maintain the roads and highways in a reasonably safe condition for a reasonably prudent driver. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Devall v. Morgan, 424 So.2d 522 (La.App. 5th Cir.1982), writs denied [427 So.2d 1214] March 4, 1983.
. . . . . .
A defect [for purposes of determining liability under either C.C. art. 2315 or 2317] is some flaw or fault existing or inherent in the thing itself that creates an unreasonable risk of harm to others.
Despite the age of this highway, there was no evidence that other accidents *1071 had occurred in the curve. In determining whether the alleged defect, i.e., advisory sign, speed sign, and their location, the width of the highway in the curve, the curvature of the curve, the width of the shoulders and location of the tree in proximity to the highway, the test must be made in relationship to the ordinary reasonably prudent driver.
. . . . . .
This Court does not believe the alleged defects constituted any unreasonable risk of injury to the ordinarily prudent driver. [Bolding added].
The factual similarities between Pleune and the instant case are remarkable, as shown on the following chart:

 FACTS PLEUNE MYERS
1. La. Hwy. # 989.1 37
2. Date Hwy. came into Louisiana 1928 1927
 system
3. Class of roadway IV III
4. Date of accident Feb. 11, 1980 Nov. 1, 1981
5. Road configuration at site of Curve Straight
 accident (22° 73')
6. Width of roadway 18' 24'
7. Width of shoulder 1½to 3' 1' to 2'
8. Width of roadside ditch Unknown 10'
9. Depth of roadside ditch 2' to 3' 2½
10. Horizontal-vertical slope ratio of Unknown 2 horizontal
 ditch to 1 vertical
11. Present ASHTO[4] minimum slope Unknown 4 horizontal
 ratio for ditch for roadway class to 1 vertical
12. Distance from roadway to tree 7½' to 8' 9'
 (hackberry) (oak)
13. Width of tree 3' 3½'
14. Present ASHTO minimum standard 18' 30'
 for horizontal clearance off
 roadway for roadway class
15. Distance traveled off roadway 95' 87'
 before hitting tree
16. Evidence of other accidents with None None
 tree
17. Cause of emergency Host driver lost Oncoming vehicle
 control in curve in host driver's
 lane of travel

*1072
18. Speed limit 30 mph 45 mph
 (advisory)
19. History of work on roadway 1931-graveled 1939-paved
 1949-black-topped 1958-overlaid
 1977-complete and widened
 asphalt overlay 1977-overlaid
 and widened

This panel of this court affirmed the dismissal of Pleune's claim against DOTD with the following rationale:
After examining the testimony of both experts in the fields of traffic engineering, highway design and accident reconstruction, we cannot say the Trial Court abused its great discretion by choosing one expert over another. The Trial Court's finding that the factors of width of the highway in the curve, the degree of curvature, the width of the shoulders, the type of location of the advisory and speed signs and the proximity of the tree to the asphalt roadway, in combination, did not constitute an unreasonable risk of injury to the ordinarily prudent driver, therefore not a defect within the intendment of Article 2317 of the Civil Code and the jurisprudence interpretive of it, is not manifestly erroneous and we will not disturb it. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
From the viewpoints of the guest passengers in Pleune and the instant case, it is irrelevant whether the host vehicle left the roadway because of host driver error or third party driver error. In both situations, the host vehicles left the roadway due to emergencies not caused by the guest passenger. If the State was required to provide a "safe zone to maneuver" for the Myers vehicle, why was it not required to provide one for the Pleune vehicle (especially since the Pleune tree was closer to the roadway)? The duty owed by the State to the guest passenger in either situation should be the same.

LIABILITY OF BRISTER
The majority applied the manifest error (clearly wrong) rule of Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) to review all of the trial court's findings of fact. However, the testimony of the host driver, Brister, was presented by deposition because he was in the United States Navy in Florida at the time of trial. The manifest error (clearly wrong) rule is not applicable to appellate review of facts presented by deposition; the reviewing court may review a deposition and make its own determination of a preponderance of the evidence. Hayes v. Commercial Union Assurance Company, 459 So.2d 1245 (La.App. 1st Cir. 1984), writ denied, 462 So.2d 1247 (La. 1985) and the cases cited therein. The majority committed error by doing otherwise.
The accident occurred before dawn. Brister testified there was a light ground fog, the roadway was damp and he was driving 45 to 50 miles per hour. He observed a white four door Chevrolet straddling the center line of the roadway about 100 yards away. The oncoming vehicle then was 3/4 in Brister's lane of travel. Brister did not blow his horn or apply his brakes and did not remember taking his foot off of the accelerator. Brister testified he made a right turn maneuver to the corner of the ditch; the car slid into the ditch; he tried to turn back to the left, but the car failed to respond; and then he hit the tree. However, the investigating officer, Trooper Gary J. Vines, found no skidmarks on the roadway, measured and found the Brister vehicle left the roadway 87 feet from the tree and found a "fairly straight line to the point of impact" with no sign of turning or veering. At the point where the vehicle hit the tree, it was 21 *1073 feet from the center line of the roadway to the tree. These facts show Brister was negligent by not braking and slowing his speed so he could maintain control of his vehicle. This is particularly pertinent because he admitted driving at or above the posted speed on a damp roadway in a light fog.
The holding of the majority to the contrary was error.
For the foregoing reasons, I respectfully dissent.

ON REHEARING
EDWARDS, Judge.
We granted a rehearing in this case for the limited purpose of clarifying our opinion on original hearing. We never intended to hold, despite the dissenting judge's reading of our opinion, that the State is required to provide shoulders for all highways. To the end of assuaging the dissent's fear of the "awesome" implications of this decision, we clarify our holding as follows. It must be remembered that road improvements had virtually eaten up what had originally been four-foot shoulders on this road and had effectively brought existing roadside obstructions nearer the roadway. In addition the road sloped sharply into a ditch where the tree in this case was located. It is the combination of these several factors, under the peculiar circumstances of this case, which we hold constitutes negligence, that is, a breach of the duty to maintain roadways in a reasonably safe condition.
LANIER, J., dissents from the opinion on rehearing and assigns reasons.
LANIER, Judge, dissenting.
The majority's opinion on rehearing is an attempt to clarify its original opinion. It has failed to achieve this result. It has achieved the evisceration of the original rationale and the perpetuation of the same erroneous result. The majority opinion on rehearing also substantially deviates from existing law and jurisprudence and raises numerous unanswered questions.

PERTINENT STATUTORY DEFINITIONS
In La.R.S. 48:1(11), (20), (21) and (22), the legislature has defined the following terms which are applicable in the instant case:
(11) "Highway" means a public way for vehicular, mounted, and pedestrian traffic, including the entire area dedicated thereto and the bridges, culverts, structures, appurtenances, and features necessary to or associated with its purposes.
....
(20) "Roadway" means that portion of a highway improved, designed or ordinarily used for vehicular traffic, exclusive of the berm or shoulder.
(21) "Shoulder" means the portion of the highway contiguous with the roadway for accommodation for stopped vehicles, for emergency use and for lateral support of base and surface.
(22) "Roadside ditch" means any ditch constructed or maintained by the highway agency having jurisdiction over the highway, contiguous to the shoulder thereof, for the purpose of draining the highway. (Emphasis added.)

THE MAJORITY'S HOLDING
The majority now concedes that the State is not "required to provide shoulders for all highways." Stated another way, the State is not required to provide "a safe zone in which to maneuver ... under emergency conditions." In the absence of such a duty, the majority has found a combination of the following factors constitutes negligence:[1] (1) maintaining a road which "sloped sharply into a ditch where the tree *1074 in this case was located", (2) improving the traveled portion of the highway which "effectively brought existing roadside obstructions nearer the roadway" and (3) "the combination of these several factors, under the peculiar circumstances of this case". These factors shall be analyzed individually to evaluate their merit.

THE TREE IN THE ROADSIDE DITCH
It is well settled that the State owes a duty to the traveling public to maintain the roadway and the shoulder of a highway in a reasonably safe condition for vehicular use. LeBlanc v. State, 419 So.2d 853 (La. 1982); Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979). The roadway and shoulder of the highway are intended for vehicular use by statutory definition. However, the roadside ditch by statutory definition is constructed and maintained "for the purpose of draining the highway"; it is not intended for vehicular use. The majority opinion on rehearing holds that the presence of a tree in the roadside ditch is an element of negligent liability in a vehicular accident. The majority cites no authority for this holding. The obvious implication of such a holding is that the State owes some kind of duty to the traveling public to maintain the roadside ditch of a highway in a reasonably safe condition for vehicular use, despite the fact that the roadside ditch is not intended for such use. (Liability only occurs when a breach of a duty causes injury.)
If there is no duty on the State to provide a safe zone in which to maneuver a vehicle under emergency conditions in this case, how can the presence of a tree in a roadside ditch be an element of negligence? The ditch is not intended by law for vehicular use; it is intended and designed for drainage. People do not go for Sunday rides in roadside ditches. The slope of the roadside ditch is designed to channel water into the ditch. Because the roadside ditch is intended for drainage purposes and not vehicular use, the presence of the tree (or any other object) in the ditch cannot be relevant, as a matter of law, to vehicular use of the roadway and shoulder.
Another implication of the majority holding on rehearing is that, if the State had removed the tree from the roadside ditch, there would be no negligent liability in this case. To analyze the logic of this implication, let us assume that the obstruction in the roadside ditch herein was something other than a tree. For example, the owner of land abutting a public highway has a limited right of access to the roadway. Dickie's Sportman's Centers, Inc. v. Department of Transportation and Development, 477 So.2d 744 (La.App. 1st Cir.1985), writ denied, 478 So.2d 530 (La.1985). Thus, many landowners put culverts in roadside ditches and build driveways over them to gain access to the roadway. Suppose in the instant case Brister had hit a concrete and steel driveway and culvert in the roadside ditch, instead of the tree. What would be the liability of the State? Does the State's liability depend on the organic or inorganic chemical composition of the obstacle in the ditch? The evidence of record indicates there are many driveways across the roadside ditch along the Greenwell Springs Road. There are many driveways across roadside ditches in Louisiana. From the point of view of vehicular travel and impact, there is no distinction between hitting a tree or a concrete and steel driveway. If the State must remove trees from roadside ditches for driving safety, as the majority implies, then it would seem that the State should also remove driveways therefrom for the same reason.

IMPROVEMENTS THAT BRING THE ROADWAY CLOSER TO OBSTACLES LOCATED IN THE ROADSIDE DITCH
The evidence shows the Greenwell Springs Road came into the State highway *1075 system in 1927. In 1939, the roadway was paved with two 9-foot lanes. In 1958, the roadway was resurfaced into two 10-foot lanes with 3-foot gravel shoulders. In 1977, the roadway was again resurfaced into two 12-foot lanes with 1-foot shoulders. The parties stipulated that the tree in the roadside ditch "was there when the first known construction was commenced on Greenwell Springs Road and it has been in the same position ever since."
Initially, it should be noted there is no evidence in the record that there was a defect in the roadway itself or in the shoulder itself. The majority finds that the action of the State in increasing the size of the roadway and, thus, bringing the roadway closer to a tree in the roadside ditch is an element of negligence.
As indicated in the definitions set forth hereinabove, the roadway and the shoulder are both designed for use by vehicular traffic. In 1957, when the Greenwell Springs Road was resurfaced into two 10-foot lanes with 3-foot gravel shoulders, there was 13 feet on each side of the highway center line intended for vehicular use. By statutory definition, the roadside ditch is not intended for vehicular use; its purpose is to drain the highway. When the Greenwell Springs Road was again resurfaced in 1977 into two 12-foot lanes with 1-foot shoulders, the portion of the highway intended for vehicular use remained 13 feet. How can improving the portion of the highway intended for vehicular use (roadway and shoulder) be an element of negligence when the width of the highway intended for vehicular use remains the same? Stated another way, if Brister had run off the 10-foot roadway and the 3-foot shoulder and into the roadside ditch prior to 1977, would the combination of the roadway, shoulder and ditch be an element of negligence? The distance between the tree in the roadside ditch and the portion of the highway intended for vehicular use (roadway and shoulder) was the same before 1977 as it was after 1977. Because the width of the highway intended for vehicular use was the same before 1977 as it was after 1977, this factor cannot be an element of negligence.

PECULIAR CIRCUMSTANCES
The majority holds that the widening of the roadway to bring it closer to the tree in the roadside ditch, combined with the "peculiar circumstances of this case", constitute negligence. What are these peculiar circumstances? The majority does not state what they are. The roadway was straight and had a 45 mile per hour speed limit. The testimony indicates Greenwell Springs Road has the same general appearance throughout its length. Indeed, the description of this highway is similar to many Class III and Class IV State highways and many parochial and municipal roads and streets. Is it a peculiar circumstance that Brister had to take evasive action because an oncoming vehicle wandered into his lane of travel? How often does such a situation occur on a daily basis in Louisiana? Does it make any difference to the guest passenger plaintiff whether Brister simply lost control, went to sleep, had a blowout or was forced off of the roadway by an oncoming vehicle? In any such event, the configuration of the roadway and the location of the tree would be the same, the fact of the accident would be the same and the injuries to the guest passenger would be the same. Is the majority implying that for purposes of the liability of the State from the injured guest passenger's point of view that these different factual scenarios are distinguishable? Is the majority implying that the State is liable if an oncoming car forces the host driver off of the roadway and shoulder, but is not liable in the other factual situations? If the majority does not intend to imply these things, then the phrase "peculiar circumstances" used by the majority is meaningless in the instant case.

PRACTICAL EFFECT OF MAJORITY OPINION
If improving and widening a roadway brings it in closer proximity to a roadside obstacle and such action is an element of *1076 negligence, what steps can the State take to avoid liability for similar existing situations on a statewide basis, and what action (or inaction) should the State take in the future to avoid similar situations? How many miles of roadway have been widened in Louisiana to bring them closer to existing roadside trees, telephone poles, driveways, water hydrants, mail boxes and other roadside obstructions? For what distance from the center line of the roadway is the State (or any other governmental entity) obliged not to widen roadways if they are brought closer to roadside obstructions? Should the State refrain from improving and widening roadways until such time as funding is available to remove all roadside obstacles within the distance of its responsibility along the length of the improvement? The implications of the majority's opinion on rehearing raise numerous questions which sooner or later will have to be litigated.
For the foregoing reasons, I dissent.
NOTES
[*] This appeal concerns only plaintiff's case against the Department of Transportation and Development.
[1] Shoulder is defined in La.R.S. 48:1(21) as the portion of the highway contiguous with the roadway for accommodation for stopped vehicles, for emergency use and for lateral support of base and surface.
[2] The majority does not find a defect, such as a rut, in the shoulder itself. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979).
[3] In LeBlanc v. State, 419 So.2d 853, 856 (La. 1982), a majority of the court in dictum observed that "[a] highway without a shoulder or one which never permits safe deviation from the main traffic lanes would be intolerably unsafe."
[4] American Association of State Highways and Transportation Officials.
[1] The only difference between negligent liability and strict liability is the element of the defendant's scienter. In negligent liability, the plaintiff must show the defendant either knew or should have known of the defect, whereas under strict liability, the plaintiff is relieved of proving this element. The duty imposed on a defendant under either strict or negligent liability is the same. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982); Buchanan v. Tangipahoa Parish Police Jury, 426 So.2d 720 (La.App. 1st Cir.1983). In the instant case, the State knew of the configuration of the roadway and the shoulder and of the existence of the tree in the ditch. In this posture, it makes no difference whether this case is treated as one of strict or negligent liability.